[No. A053098. First Dist., Div. One. Jan. 29, 1993.]

SHERI R. TRAXLER, Plaintiff and Appellant, v.
ROBERT VARADY et al., Defendants and Respondents.

## COUNSEL

Crow, Sevey, Gilwee, Alpar & Tronvig, Gerald J. Adler, Wilcoxen, Callahan, Montgomery & Harbison and Gary B. Callahan for Plaintiff and Appellant.

Charles Bond, Stefanie Y. Gandolfi, Heather McKee, Anderson, Galloway & Lucchese, Robert L. Anderson, Crosby, Heafey, Roach & May, James M. Wood, James C. Martin, Peter L. Shaw, McNamara, Houston, Dodge, McClure & Ney, Richard E. Dodge and Denise Billups-Slone for Defendants and Respondents.

Horvitz & Levy, Frederic D. Cohen and Julie L. Woods as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**STEIN, J.**—Shortly after giving birth to her daughter in 1982, appellant, Sheri R. Traxler, received a blood transfusion. By 1988, when Sheri Traxler first learned that she, tragically, had become one of the approximately 600,000 women worldwide who are now afflicted with Acquired Immune

Deficiency Syndrome (AIDS), the human immunodeficiency virus (HIV) had been identified and the risk of infection through blood transfusion discovered. Unable to regain her health, appellant seeks damages from defendants Robert Varady, M.D., James C. Heinrich, M.D., Chris Cammisa, M.D., Fairfield Medical Group, Inc., and NorthBay Medical Center (hereinafter, hospital) alleging that various negligent acts had caused her to receive the HIV-tainted blood transfusion. She appeals from a judgment in favor of all defendants, contending that the court erred by refusing to give requested jury instructions on negligence per se, informed consent and battery.

## FACTS

After a normal pregnancy under the care of Dr. Chris Cammisa, appellant was admitted to NorthBay Medical Center where Dr. Robert Varady delivered her baby. Since this was Dr. Varady's first delivery at the NorthBay Medical Center, Dr. James Heinrich was designated as his "proctor." After appellant gave birth to a normal baby girl by vaginal delivery, Dr. Varady examined the placenta and concluded that it was intact, meaning that no significant amount of placental tissue had been retained in the uterus.

Two weeks later, appellant began severe hemorrhaging, was rushed to the hospital and signed a consent form authorizing a dilatation and curettage procedure (D&C).[1] Dr. Cammisa estimated that appellant had already lost approximately two pints of blood and suspected that a blood transfusion might be necessary. He ordered two units of blood to be held for appellant. Dr. Cammisa then performed the D&C and removed some "necrotic-appearing tissue." Unexpectedly, appellant continued to hemorrhage. After consulting with Dr. Heinrich, Dr. Cammisa placed appellant under general anesthesia and performed a second D&C. Only a few blood clots, which did not explain why appellant continued to hemorrhage, were found.

In the recovery room Dr. Heinrich evaluated appellant's condition. Her total documented blood loss during this period comprised approximately 30-40 percent of her total blood volume. His primary concern was that she could hemorrhage again at anytime. Renewed hemorrhaging had occurred in

---

[1]The form stated, in pertinent part, as follows: "1. I authorize and direct Dr. Cammisa my surgeon and/or associates or assistants of his choice, to perform the following operation on me [suction curettage] and/or to do any other therapeutic procedure that (his) (their) judgment may dictate to be advisable for the patient's well being. The nature of the operation has been explained to me and no warranty or guarantee has been made as to the result or cure. [¶] 2. I hereby authorize and direct the above-named surgeon and/or his associates or assistants to provide such additional services for me as he or they may deem reasonable or necessary, including but not limited to the administration and maintenance of anesthesia, and the performance of services involving pathology and radiology, and I hereby consent thereto."

approximately 10 percent of his postpartum hemorrhage cases. If she were to bleed again, an emergency hysterectomy would probably have to be performed. Dr. Heinrich was concerned that in her weakened condition appellant could not tolerate such a procedure and there would not be enough time to transfuse her if she rehemorrhaged. In his judgment, appellant's mental state was still compromised by the anesthesia and other medication she had been given, including Valium and codeine. After conferring with Dr. Cammisa, who concurred with his assessment, Dr. Heinrich ordered that appellant receive two units of blood.

In 1988, after being notified by the Irwin Memorial Blood Bank that she might have received HIV-infected blood, appellant tested positive for the presence of the HIV virus. It was undisputed at trial that in 1982 the HIV virus had not yet been identified and that the risk of receiving HIV-tainted blood through a transfusion was unknown.

Appellant's theory of liability was that Dr. Varady negligently performed the delivery by failing to ensure that no placental tissue was retained; that his negligence caused her to hemorrhage. She further alleged that Dr. Heinrich ordered an unnecessary transfusion, to which she did not give her informed consent. A unanimous jury found no negligence on the part of any of the defendants.

ANALYSIS

I.

Appellant contends the trial court erred in refusing to give her requested instruction on "negligence per se."

Appellant's requested instruction read as follows: "If you find that a party to this action violated Title 22, California [Code of Regulations] Sections 70213(a) and (d); 70231; 70233; 70235; 70703; 70706; 70706.2; 70707; 70747; 70749; 70751(a)(h) and 70753,[2] the Statutes and code sections just read to you, and that such a violation was a legal cause of injury to another, you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that he was faced with circumstances which prevented compliance or justified noncompliance with the statutes and codes."

---

[2]Unless otherwise noted, all further title and section cites are to the Code of Regulations.

Appellant has abandoned any claim of error as to most of the subdivisions of title 22 listed in her proposed instruction. She now contends only that the court should have given her requested negligence per se instruction with respect to title 22, section 70223, subdivision (g), and section 70707.[3]

### A—Section 70223, Subdivision (g)

■ We conclude that the trial court correctly refused to give appellant's requested instruction on section 70223, subdivision (g), because the elements set forth in Evidence Code section 669, defining when an alleged violation of statute or regulation supports a presumption of negligence per se, were not supported by the evidence.[4]

Section 669 of the Evidence Code provides that: "(a) The failure of a person to exercise due care is presumed if: (1) He violated a . . . regulation of a public entity; (2) The violation proximately caused death or injury. . . ; (3) The death or injury resulted from an occurrence of the nature which the . . . regulation was designed to prevent; and (4) The person suffering the death or injury to his person . . . was one of the class of persons for whose protection the . . . regulation was adopted." ■ The burden is on the proponent of a negligence per se instruction to demonstrate that these elements are met. (*Ronald M.* v. *White* (1980) 112 Cal.App.3d 473, 477 [169 Cal.Rptr. 370].) The first and second elements of section 669, although normally questions of fact for the jury, may be resolved by the court as a matter of law where reasonable minds could not differ as to whether a violation of the regulation actually occurred or whether the violation proximately caused the plaintiff's injuries. (*Capolungo* v. *Bondi* (1986) 179 Cal.App.3d 346, 354 [224 Cal.Rptr. 326]; *Horn* v. *Oh* (1983) 147 Cal.App.3d 1094, 1101-1102 [195 Cal.Rptr. 720].) The third and fourth elements of Evidence Code section 669 must be determined by the court as a matter of law.

Section 70223, subdivision (g), of title 22 provides, in part, that "All anatomical parts, tissues and foreign objects removed by operation shall be delivered to a pathologist designated by the hospital and a report of his

---

[3]Appellant makes no attempt to demonstrate that the instruction as a whole was proper. Since the court has no duty to refine or revise an incorrect or overbroad instruction, it was properly refused on the basis it was overbroad. (*Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 190-191 [231 Cal.Rptr. 791]; *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 14 [87 Cal.Rptr. 108].)

[4]We further find that appellant has failed to demonstrate that she was prejudiced by the refusal to give her proposed instruction. It is, therefore, unnecessary for us to address the broader issues raised by the hospital, physician respondents and amicus curiae as to whether, and in what circumstance, any of the title 22 regulations can ever be used to define a standard of care for hospitals or physicians.

findings shall be filed in the patient's medical record." The trial court granted the hospital's motion for summary adjudication as to this regulation based in part on the conclusion that "Failure to send tissue removed during [appellant's] dilation and curettement to the pathologist for examination did not cause plaintiff's injury, *e.g.*, exposure to the HIV virus." In opposition to the hospital's motion for summary adjudication, appellant offered no evidence that, if all the tissue removed during the two D&C's had been sent to a pathologist for examination, she would not have required a blood transfusion. The decision to order a blood transfusion was independent of the presence or absence of any pathology finding. Dr. Heinrich ordered the transfusion because appellant had lost a great deal of blood and in his judgment she was at risk if she began to hemorrhage again. Appellant failed to demonstrate how Dr. Heinrich's decision, made shortly following the surgery, could in any way have been affected by a subsequent pathology report. The pathology report, at best, might have offered some explanation for the *cause* of her bleeding but it could not have prevented her prior hemorrhaging or reduce the chances of her rehemorrahaging, which in turn necessitated the blood transfusion. ██ Because of the total absence of any causal relationship between the decision to give appellant a transfusion and the alleged failure to send any or all of the tissue removed during the D&C operations to the pathology lab, the court correctly determined that, as a matter of law, the alleged violation of section 70223, subdivision (g), did not proximately cause appellant's injury.[5] (See *Capolungo* v. *Bondi, supra,* 179 Cal.App.3d at p. 354.)

██ Although conceding that "the failure to send the tissue to pathology certainly did not cause appellant to become infected," appellant argues that the evidence supports the inference that Drs. Cammisa and Varady violated section 70223 by failing to send *all* the tissue they removed in the first D&C procedure to pathology. She alleges this failure to have all the tissue examined by a pathologist prevented "appellant from proving that Dr. Varady's negligence in the delivery of the placenta [following childbirth] was the first link in the chain of [her] infection." In other words, appellant argues that she should have been permitted to prove Drs. Varady's and Cammisa's alleged violation of section 70223 and have the jury instructed on negligence per se in support of her contention that *they concealed proof* of Dr. Varady's primary negligence in the delivery of appellant's daughter.

Putting aside the very substantial question whether spoilation of evidence is the type of injury section 70223 is designed to prevent, the issue is waived

---

[5]The court also found that *none* of the title 22 regulations could be used to define the standard of care for physicians. It is unnecessary to determine whether this broader aspect of the court's summary adjudication was correct, because even if section 70223 could, in the appropriate factual circumstances, be used to define the standard of care for physicians, we affirm the court's determination that the alleged violation of this section did not proximately cause appellant's injuries.

because it was never presented in the trial court. (See, e.g., *In re Andre P.* (1991) 226 Cal.App.3d 1164, 1169 [277 Cal.Rptr. 363]; *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 771, fn. 17 [269 Cal.Rptr. 796].) Moreover, the instruction submitted did not inform the jury that, if it found that the doctors had violated this section during the D&C procedure, it would create a presumption that their *prior conduct* during the delivery was negligent. We have found no authority permitting the use of a *subsequent* violation of a statute to create a presumption that a party was negligent at some *prior* occasion.

■  In her final argument with respect to section 70223, subdivision (g), appellant asserts that the section applied to the original vaginal delivery of the placenta, which should have been sent to a pathologist for examination.

We find no error in refusing the instruction. Section 79223, subdivision (g) has no application to these facts, because the placenta was not removed "by operation." At trial, exhaustive evidence was presented to the effect that placentas typically are not sent to pathology following a normal, uncomplicated delivery. A placenta in a normal vaginal delivery is expelled by the mother's uterine contractions and the force of gravity, assisted by the doctor's application of gentle traction. No reasonable jury would have found that the placenta was removed "by operation." Therefore the refusal to give the instruction on this theory, if error, would be harmless. (See, e.g., *Murphy* v. *Atchison, T. & S. F. Railway* (1958) 162 Cal.App.2d 818, 822-824 [329 P.2d 75].)

Appellant speculates that if Dr. Varady had sent the apparently normal and intact placenta to pathology after the childbirth, a pathologist might have discerned that some placental tissue had been retained and, therefore, (assuming that was the cause of the hemorrhaging) the doctor could have taken measures to prevent the hemorrhaging, thereby eliminating the need for the transfusion. Although, appellant was permitted at trial, in the context of a common law negligence claim, to advance her theory that Dr. Varady was negligent in failing to have the placenta examined by a pathologist, she does not cite any evidence that a pathology lab could have discerned that a significant amount of placental tissue had been retained and thereby prevented the hemorrhaging. Appellant has thus failed to show that the alleged violation of section 70223, subdivision (g) proximately caused her injury. (See Evid. Code, § 669, subd. (a)(2).) We therefore are persuaded that refusal to give the instruction, if error, was harmless. (See, e.g., *Murphy* v. *Atchison, T. & S. F. Railway, supra,* 162 Cal.App.2d at pp. 822-824.)

*B—Section 70707*

■  Appellant also contends that the court should have given a negligence per se instruction based on section 70707.

Section 70707 provides, in pertinent part, that the hospital must adopt and post a policy on patients' rights. The posted list "shall include but not be limited to the patients' rights to: . . . [¶] (4) Receive information about the illness, the course of treatment and prospects for recovery in terms that the patient can understand. [¶] (5) Receive as much information about any proposed treatment or procedure as the patient may need in order to give informed consent or to refuse this course of treatment. Except in emergencies, this information shall include a description of the procedure or treatment, the medically significant risks involved in this treatment, alternate courses of treatment or nontreatment and the risks involved in each and to know the name of the person who will carry out the procedure or treatment. . . ." Subdivision (d) provides that "[a]ll hospital personnel shall observe these patients' rights."

Appellant again fails to demonstrate that she was prejudiced by the failure to give a "negligence per se" instruction based on this section. Section 70707 requires nothing more than that the patient's informed consent be obtained. The section does not offer a definition of the term "informed consent" that differs in any significant respect with the common law. In *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], the leading case defining the scope of a physician's duty to obtain the patient's informed consent, the court held that "there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.* at p. 243.) The court further held that the duty to make such disclosure is excused when an emergency exists, or when the patient is incompetent. (*Ibid.*) We are unable to discern any significant respect in which the standard set forth in section 70707 differs from the common law standard.

The jury was fully instructed on the common law duty to obtain a patient's informed consent, and what constitutes an emergency, excusing the performance of this duty. By its unanimous verdict, the jury concluded that appellant either gave informed consent or her consent was implied under the circumstances. Thus, refusing to give the requested instruction, if error, was harmless. It is not reasonably probable that the result would have been different had the requested instruction been given.[6] (See *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 523-524 [196 Cal.Rptr. 82].)

---

[6]The hospital argues that this regulation does not impose a duty on the *hospital* to ensure that the treating physicians obtain the patient's informed consent. The treating physicians in turn contend that this regulation does not define the *physician's* standard of care in obtaining a patient's informed consent, which they contend can only be established through expert testimony. We need not address these broader questions because we find the issues of informed consent and whether an emergency existed were fully presented to the jury under

## II.

■ Appellant next contends that the court erred in refusing her instruction on "informed consent." Appellant requested the following instruction: "A physician rendering a diagnosis has a duty to inform the patient that other members of the medical profession might render a different diagnosis based on a contrary recognized school of thought." This instruction is based on dicta in *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223, 232 [166 Cal.Rptr. 443], to the effect that, *had the plaintiff requested an appropriate instruction,* the pathologist could have been found negligent for failure to inform the patient that her ovarian teratoma contained immature tissue and that some pathologists believed such tissue to be malignant. (*Id.* at p. 231.) The factual predicate to giving such an instruction, however, must be evidence that the defendant was aware of conflicting "schools of thought" with respect to diagnosis or, in this case, treatment.

Appellant cites no evidence that there were divergent "schools of thought" regarding any of the decisions made by her treating physicians. The requested instruction was, therefore, properly refused. (*Scalere* v. *Stenson* (1989) 211 Cal.App.3d 1446, 1451 [260 Cal.Rptr. 152]; see also *Mathis* v. *Morrissey* (1992) 11 Cal.App.4th 332, 343 [13 Cal.Rptr.2d 819].)

■ Appellant also contends that the court erred in refusing to supplement the instructions given on informed consent with the following language excerpted from *Cobbs* v. *Grant, supra,* 8 Cal.3d at page 243: "[A physician has] a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each."

The court gave complete instructions on informed consent, including BAJI No. 6.11, which is based on the holding in *Cobbs* v. *Grant, supra,* 8 Cal.3d at page 243. The instruction appellant requested was simply a slightly more specific restatement of the principle already stated in BAJI No. 6.11 that "it is the duty of the physician to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed operation or treatment. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. . . ." The court is not required to instruct in the specific words requested by a party so long as the jury is adequately instructed on the applicable law. (See, e.g., *Tossman* v. *Newman*

other instructions given, and the verdict would not have been any different had the court given the requested instruction.

(1951) 37 Cal.2d 522, 525 [233 P.2d 1]; *Kraft* v. *Nemeth* (1952) 115 Cal.App.2d 50, 54 [251 P.2d 355]; *Johns* v. *Ward* (1959) 170 Cal.App.2d 780, 789 [339 P.2d 926].) Nor is it error to refuse an instruction excerpting specific language from an opinion if the principle expressed by the excerpted language is encompassed by the more general instruction already given. (*Sloan* v. *Stearns* (1955) 137 Cal.App.2d 289, 299-300 [290 P.2d 382].)

## III.

██  Finally, appellant contends that the court erred by refusing to instruct the jury on the tort of battery.

Appellant contends she had a cause of action for battery based on her contentions that her written consent to the D&C and "any other therapeutic procedure that (his) (their) judgment may dictate to be advisable for the patient's well being" did not include consent to the transfusion, and her consent to the transfusion could not be implied because no emergency or other circumstance existed excusing the treating physicians from obtaining a separate consent to the blood transfusion.

██  In *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, the court explained that: "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present." (*Id.* at p. 240.)[7]

Respondents contend that appellant's cause of action lay only in negligence. In *Cobbs* the court explained that when the physician obtains a patient's consent and some undisclosed complication with a low probability of occurrence develops, the patient's cause of action lies in negligence only. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at page 240-241.) Respondents argue that the attending physicians obtained appellant's consent to the D&C and that the continued hemorrhaging which led to the transfusion was, at worst, an undisclosed complication. This argument certainly applies to the hemorrhaging, but begs the question whether the transfusion was a second procedure outside the scope of the patient's original consent.

---

[7]Similarly, where consent is conditional and the doctor proceeds without observing the condition placed on the patient's consent, the patient may have a cause of action for battery. (See, e.g., *Ashcraft* v. *King* (1991) 228 Cal.App.3d 604 [278 Cal.Rptr. 900] [patient had cause of action for battery where she alleged that she consented to back surgery on the condition that, if a blood transfusion was needed, the physician would use blood donated by family members, and instead doctor used blood from general hospital supply, which turned out to be HIV contaminated].)

■ Although the refusal to give battery instructions is not always rendered harmless by a defense verdict under informed consent instructions (see *Ashcraft* v. *King, supra,* 228 Cal.App.3d 604), in this case appellant's "informed consent theory" was based on the same facts as her "battery theory." In *Ashcraft,* the trial court erroneously refused to give battery instructions based on plaintiff's contention that the surgeon intentionally deviated from her conditional consent. The court held that the jury verdict in favor of the surgeon on the informed consent theory did not support the conclusion that the refusal to instruct on battery was not prejudicial because the "jury could have found defendant adequately informed Ms. Ashcraft of all significant risks of the surgery, including the risk involved in blood transfusions, *before* obtaining her consent and still have found defendant liable for battery because he violated the conditional consent Ms. Ashcraft gave after being informed of those risks." (*Id.* at p. 616.) By contrast, in this case, appellant does not contend that she placed any conditions upon her consent. Instead, she contends that she did not give her consent, that her consent could not be implied, and that if she did give consent, it was not informed consent.

The jury, by its verdict on appellant's informed consent cause of action, must have found either that appellant consented or that her consent was implied under the circumstances. Therefore, any error in refusing to instruct on battery was harmless. (See, e.g., *Lussier* v. *San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 106-107 [253 Cal.Rptr. 470].)

CONCLUSION

The judgment is affirmed.

Strankman, P. J., and Dossee, J., concurred.