[No. G032653. Fourth Dist., Div. Three. Nov. 12, 2004.]

REY PIEDRA, a Minor, etc., Plaintiff and Appellant, v.
J. M. DUGAN, Defendant and Respondent.

## COUNSEL

Hoyt E. Hart II for Plaintiff and Appellant.

Horvitz & Levy, H. Thomas Watson, Tracy L. Turner; Ahrens & Rosa and Stephen A. Rosa for Defendant and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Rey Piedra, an infant, suffered cardiac arrest, resulting in severe brain damage. Rey's parents, Jesus Piedra and Agripina Arroyo, as Rey's guardians ad litem, sued Rey's treating physician, Dr. J. M. Dugan, for medical malpractice, negligent failure to obtain informed consent, and battery. The trial court granted a motion for nonsuit on the battery claim, and the jury found in favor of Dr. Dugan on the malpractice and informed consent claims.

 We conclude the trial court did not err by granting the nonsuit motion on the battery claim. Dr. Dugan was unaware of any condition on the parents' consent to treatment. Therefore, we hold the physician could not be liable for

battery because he did not intentionally violate the condition on the consent while treating plaintiff. Given the jury's verdict on the claim for lack of informed consent, even if the court erred in granting the nonsuit, any such error was harmless.

We also conclude there was substantial evidence to support the jury's verdict on the claim for lack of informed consent; the trial court did not err in instructing the jury regarding the settlement between plaintiff and the other defendants; and the trial court did not err by submitting to the jury the issue of the gross amount of future damages, rather than the present value of those damages. Therefore, we affirm.

## STATEMENT OF FACTS

On April 21, 1994, six-month-old Rey Piedra was admitted to Fountain Valley Regional Hospital and Medical Center (Fountain Valley) with a suspected seizure disorder. Upon his discharge from the hospital on April 25, Rey's treatment was phenobarbital twice a day to prevent seizures. Rey developed a rash over his entire body, swelling, and a swollen abdomen, and eventually stopped eating. Rey's mother cut the phenobarbital dose in half, and then stopped giving Rey any medications on May 17.

Rey was readmitted to Fountain Valley on May 20. The on-call physician ordered that phenobarbital be discontinued and replaced with another anticonvulsant, Ativan, as needed for seizures lasting longer than two minutes.

At Fountain Valley, Rey's mother signed a form regarding the conditions of admission, in which she consented to "the procedures which may be performed during this hospitalization . . . , including emergency treatment or services, and which may include, but are not limited to laboratory procedures, x-ray examination, medical or surgical treatment or procedures, anesthesia, or hospital services rendered [Rey] under the general and special instructions of [Rey]'s physician or surgeon." Rey's mother testified she told the admitting person, two nurses, and Rey's attending physician, Dr. Magdalena Salcedo, not to give Rey any medication without her knowledge.[1]

---

[1] In her deposition, which was read to the jury at trial, Rey's mother had testified she told Dr. Salcedo and the Fountain Valley staff not to give Rey phenobarbital without her knowledge. One of the nurses at Fountain Valley testified Rey's parents did not say Rey should not receive any medication without their specific consent. It would be unusual for a parent to request their child not receive any medication without their permission, and that request would be noted in the patient's chart; no such notation appears in Rey's chart. Rey's chart noted his allergy to phenobarbital. A pediatric intensive care unit (PICU) nurse testified it would not be unusual for medication such as Ativan or Versed to be given to a child without advising the parents: "We do not get informed consent for use of medications. Medication is something that's ordered by the doctor. I would have to be talking to the parents with every medication.

Early the next morning, Rey was transferred to the PICU. The initial diagnosis was a drug reaction or "acute systemic reaction to medication." Dr. Dugan first saw Rey on the morning of May 21. Rey's liver was enlarged; he was dehydrated, anemic, and suffering from a rash; and he had had an allergic reaction to phenobarbital.

Rey needed fluids and blood products, which had to be administered through a central line. Dr. Salcedo explained to Rey's parents, in Spanish, that Rey needed a transfusion, and Rey's father consented in writing to the central line placement. Dr. Salcedo did not, however, discuss with Rey's parents the medications that would be used to sedate Rey during the placement of the central line. Dr. Dugan believed the consent to the central line procedure included consent to the use of the sedatives.

The placement of the central line began at 10:15 a.m., and was not completed until 3:00 p.m. Rey received two doses of Versed and four doses of ketamine before and during the course of the procedure. Those amounts of the drugs were not unusually large for this procedure in a seven-month-old child. Rey's mother was never told Rey would be given Ativan, Versed, or ketamine, or what effect those drugs might have on Rey.

Dr. Dugan ordered an echocardiogram to determine whether Rey had any cardiac abnormalities. Dr. Dugan also ordered that Ativan be administered as necessary to calm Rey during the echocardiogram, which was performed at 5:30 p.m. on May 21. A nurse administered Ativan when Rey's movements were too erratic to allow an accurate echocardiogram.

At 8:35 p.m. on May 21, Rey suffered a prolonged seizure. Dr. Dugan concluded Rey needed emergency treatment and ordered a dose of Ativan to prevent another seizure. Dr. Dugan hoped preventing further seizures would avoid the need to intubate Rey. A PICU nurse testified this dose of Ativan was administered to Rey "in response to emergency situations." Dr. Dugan acknowledged he did not obtain consent from Rey's parents for treatment or prevention of seizures with Ativan.

---

Some of our patients are on 20 meds. We do not discuss every medication." Dr. Dugan testified that, if he had been told the parents did not want Rey to be given any medications without their specific consent, he would have talked to the parents. Dr. Salcedo testified Rey's mother did not tell her not to give Rey any medications without her approval. If Rey's mother had said that, Dr. Salcedo would have documented it because it would represent a decision against medical advice.

The results of the laboratory tests, returned at 11:00 p.m., showed respiratory failure and respiratory acidosis (an increased acidity of the blood stream resulting from the inability to eliminate carbon dioxide from the body). Dr. Dugan therefore ordered an immediate dose of Mazicon to reverse the effects of Ativan (which can cause respiratory depression), and later intubated Rey. To prevent movement and reduce pain during the intubation process, Dr. Dugan gave Rey succinylcholine, Pavulon and fentanyl. Rey's parents' consent was not obtained for the intubation because it was performed due to a life-threatening emergency.

Around midnight, Rey's condition began to deteriorate rapidly, and he suffered a cardiac arrest. Dr. Dugan opined Rey's cardiac arrest was caused by hyperkalemia (a high potassium level), which is a rare adverse effect of succinylcholine. Plaintiff's expert agreed with Dr. Dugan's opinion.

Rey continued to suffer subclinical seizures, and was transferred to the University of California at Los Angeles Medical Center because Fountain Valley did not have the capability to monitor his continued seizure activity. As a result of his cardiac arrest, Rey suffered severe brain damage and is likely to remain in a vegetative state for the rest of his life.

A pharmacological expert and a pediatric neurological expert offered by plaintiff testified Rey's respiratory depression and respiratory failure were caused by the combined effects of phenobarbital, Versed, ketamine and Ativan. Plaintiff's pediatric neurological expert testified Rey probably did not suffer a seizure on the evening of May 21, but instead he had an episode of respiratory depression caused by the substantial amount of antiseizure or anticonvulsant medications in his system.

A witness, expert in anesthesiology and pediatric critical care, offered by Dr. Dugan, testified Ativan, ketamine, and Versed are commonly used drugs with low risk of harm. The expert further testified the conditions of admission form signed by Rey's mother upon Rey's admission to Fountain Valley was a general consent to give such medications. Plaintiff's expert in pediatric critical care testified the standard of care did not require written consent for the administration of ketamine, Versed, or Ativan. Additionally, plaintiff's expert testified that no special consent, written or oral, is required if the drugs are administered in an emergency situation.

## PROCEDURAL HISTORY

Plaintiff sued Dr. Dugan for professional negligence, negligent failure to inform, and battery. Shortly before trial, four of the other defendants (PacifiCare Health Systems, Inc., Fountain Valley, and Drs. Leslie Brody and

Joaquin Merida) settled with plaintiff and were dismissed from the case. Another defendant, Dr. Phillip Madrid, was dismissed prior to trial.

Before the jury began deliberating, but after both sides rested, the trial court granted a motion for nonsuit of the battery claim. In a special verdict, the jury found Dr. Dugan was not negligent in Rey's medical care or treatment, and Dr. Dugan had disclosed to Rey's parents all relevant information enabling them to make an informed decision regarding the proposed treatment to be rendered by Dr. Dugan. Judgment was entered, and plaintiff timely appealed.

## DISCUSSION

## I.

### THERE WAS SUBSTANTIAL EVIDENCE SUPPORTING THE JURY'S VERDICT ON THE NEGLIGENT FAILURE TO INFORM CLAIM.

The cause of action against Dr. Dugan for negligent failure to inform alleged he negligently "failed to disclose to Rey's parents . . . the contraindications for the use of Ativan."[2] Plaintiff argues the jury's verdict that Dr. Dugan disclosed all relevant information to enable Rey's parents to make an informed decision regarding the proposed treatment to be rendered to Rey was not supported by substantial evidence.

" 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' [Citation.] The substantial evidence standard of review is applicable to appeals from both jury and nonjury trials. [Citation.]" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143 [131 Cal.Rptr.2d 771].)

---

[2] This claim was asserted against Drs. Brody, Merida, and Dugan, and also alleged defendants "failed to disclose to Rey's parents the potential dangers inherent in the use of Phenobarbital treatment, specifically the toxic effect on the liver for those patients allergic to Phenobarbital, and the symptoms of an allergic reaction to Phenobarbital . . . ." Because Dr. Dugan never prescribed or administered phenobarbital to Rey, and in fact the phenobarbital had been discontinued before Dr. Dugan ever treated Rey, this portion of the complaint's allegations could not be directed toward Dr. Dugan.

■ Physicians have a duty to inform their patients of the known risks of death or serious bodily harm associated with proposed treatments. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 244 [104 Cal.Rptr. 505, 502 P.2d 1].) However, physicians need not discuss the risks inherent in common procedures that very rarely result in serious ill effects. (*Ibid.*) Additionally, in emergency situations, physicians need not obtain consent before treating a patient. (*Preston v. Hubbell* (1948) 87 Cal.App.2d 53, 57–58 [196 P.2d 113].) The jury was instructed on both of those exceptions.

Initially, we must identify the treatment for which Dr. Dugan allegedly failed to obtain consent. In the opening appellate brief, plaintiff argues Dr. Dugan failed to obtain informed consent from Rey's parents for the administration of Ativan, Versed, or ketamine. At trial, however, plaintiff's claim was based on the lack of informed consent to the administrations of Ativan to Rey at 5:30 p.m. and 8:35 p.m. on May 21. Neither the complaint nor the trial brief mentioned Rey's treatment with Versed or ketamine.

Dr. Dugan argues plaintiff waived the issue of the administrations of Versed and ketamine because that argument was not presented to the trial court or the jury. (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 498, fn. 9 [100 Cal.Rptr.2d 905]; *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874–879 [242 Cal.Rptr. 184].) Plaintiff does not dispute that the lack of informed consent regarding Versed and ketamine was not argued in the trial court, and agrees Dr. Dugan's "undisclosed use of Versed and [k]etamine presents an entirely different issue than his undisclosed use of Ativan." Plaintiff contends, however, "the Versed and [k]etamine remain relevant to the Ativan claim as to causation, since they helped set the stage for the over-medication, and as to the . . . lack of disclosure which was consistent with the lack of Ativan disclosure." We conclude the issue on appeal is whether there was substantial evidence to support the jury's finding that Dr. Dugan disclosed all the necessary information to Rey's parents regarding his treatment with Ativan.

It is undisputed that neither Dr. Dugan nor any member of the Fountain Valley staff specifically obtained informed consent from Rey's parents to treat him with Ativan.

There was substantial evidence Ativan is a commonly used, generally safe medication. Dr. Robert Spear, a specialist in pediatric intensive care and anesthesiology offered by Dr. Dugan, testified Ativan is "very commonly" used in PICU's and is considered a "[v]ery safe" drug. A nurse from Fountain Valley's PICU testified Ativan is "used frequently in children" and is the drug

of choice to treat children with seizures. Plaintiff's expert witness in pediatric neurology, Arnold Gale, testified Ativan is often used as an emergency drug for seizures and is considered safe. Although Dr. Dugan testified Ativan can be deadly when it interacts with other drugs, he did not testify how often it has such an effect, and thus how significant the risk is. In any event, the contradictory testimony does not change the fact there was substantial evidence Ativan is commonly used and safe.

The first dose of Ativan was administered to ensure an accurate reading of Rey's echocardiogram, a necessary and nonelective component of Dr. Dugan's treatment of Rey. While this was not an emergency procedure, Rey was facing a high probability of death absent immediate diagnosis and treatment, and the Ativan was necessary to ensure an accurate test result. Neither the echocardiogram nor the Ativan used to sedate Rey for the procedure "inherently involve[d] a known risk of death or serious bodily harm," and Dr. Dugan therefore had no duty to inform Rey's parents of, and obtain their consent to, the risks inherent in a common procedure with a rare risk of serious side effects. A very rare, but very serious, side effect occurred; however, this does not change the fact Dr. Dugan was not required to obtain Rey's parents' informed consent at the time the first dose of Ativan was administered to Rey.

There was substantial evidence the second dose of Ativan was administered to Rey under emergency conditions. The second dose was given when Dr. Dugan, relying on a nurse's observation, determined Rey was suffering a prolonged seizure accompanied by apnea and oxygen desaturation, conditions that were life-threatening. Dr. Dugan therefore determined Rey needed an anticonvulsant immediately.

Plaintiff's expert in pediatric critical care, Dr. Robert Bart, testified the second dose of Ativan was given in a nonemergency situation. (Dr. Bart's opinion was based on the PICU nurse's testimony that Rey's seizure had stopped eight minutes before the Ativan was administered.) Dr. Spear, however, testified administering medication to Rey at that time was necessary to avoid the risk of additional seizures that could interfere with respiration and require intubation. Dr. Brody, a pediatric neurologist and a former defendant in the case, testified a seizure accompanied by apnea and desaturation requires medication on an ongoing basis even after the initial seizure is over. Dr. Dugan testified the remaining level of phenobarbital in Rey's system at 8:35 p.m. on May 21 was insufficient to prevent further seizures.

Substantial evidence supported the jury's verdict that Dr. Dugan was not required to obtain Rey's parents' informed consent to the two doses of Ativan administered on May 21.

## II.

### THE COURT DID NOT ERR BY INSTRUCTING THE JURY WITH BAJI No. 14.64 REGARDING PLAINTIFF'S SETTLEMENT WITH OTHER DEFENDANTS.

The trial court instructed the jury with BAJI No. 14.64, as follows: "In this case the plaintiff has made a settlement with (1) PacifiCare Health Systems, Inc., successor-in-interest to FHP Health Care, (2) Fou[n]tain Valley Regional Hospital, (3) Leslie Brody, M.D., (4) Phillip Madrid, M.D., & (5) Joaquin Merida, M.D. The amount of the settlement has been disclosed to the court but not to you. [¶] If you find that the plaintiff is entitled to recover against the defendant James M. Dugan, M.D., then you should award damages to the plaintiff for the same amount you would have awarded as if no such settlement had been made. [¶] In that event, the court will later deduct the amount of this settlement from the amount of your award and your verdict will be reduced accordingly."

Plaintiff argues the court erred by instructing the jury with BAJI No. 14.64 because the fact of the settlement had never been disclosed to the jury.[3] Plaintiff cites no cases preventing a court from using BAJI No. 14.64 when the jury has not previously learned other defendants reached a settlement with the plaintiff. All the cases we have found require the use of this instruction rather than evidence of the amount of the settlement. (*Vahey v. Sacia* (1981) 126 Cal.App.3d 171, 179 [178 Cal.Rptr. 559]; *Shepherd v. Walley* (1972) 28 Cal.App.3d 1079, 1082 [105 Cal.Rptr. 387]; *Albrecht v. Broughton* (1970) 6 Cal.App.3d 173, 177 [85 Cal.Rptr. 659].) The absence of an attempt to offer evidence of the settlement amount does not change the appropriateness of this instruction.

Earlier in the trial, the jury was instructed: "Ladies and gentlemen, during the course of this trial you may receive testimony or other evidence which pertains to; 1, PacifiCare Health Systems, Inc.; 2, Fountain Valley Regional Hospital; 3, Leslie Brody, M.D., 4, Philip Madrid, M.D.; and 5, Joaquin Merida, M.D. Although plaintiff initially asserted a claim of medical negligence against these parties, such claim is no longer an issue in this case and those persons and entities are no longer parties in this case. Do not speculate as to why these persons and entities are no longer involved in this case. You should not consider this during your deliberations." Plaintiff agreed to this instruction.

---

[3] The jury was also instructed with BAJI No. 2.28, which reads in relevant part: "Evidence has been received that a [witness] who also was involved in the [incident] in question compromised and settled a claim." Plaintiff does not argue the use of this instruction prejudiced him in any way.

Even if the court erred by giving BAJI No. 14.64, "[a] judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) No such miscarriage of justice occurred here. Plaintiff suggests BAJI No. 14.64 caused him prejudice because the jury believed plaintiff was being greedy by pursuing Dr. Dugan after receiving a substantial sum from the other defendants. First, to accept plaintiff's argument would require us to accept that the jury completely ignored BAJI No. 14.64. Second, the jury never reached the issue of damages. (*Vahey v. Sacia, supra,* 126 Cal.App.3d at pp. 179–180 [any error in refusing to instruct with BAJI No. 14.63 or 14.64 was harmless because jury found the defendant was not negligent, and never reached the issue of damages].)

### III.

#### THE TRIAL COURT DID NOT ERR BY PREVENTING PLAINTIFF FROM OFFERING EVIDENCE OF THE PRESENT VALUE OF FUTURE DAMAGES.

■ The trial court granted defendant Dr. Merida's motion in limine to exclude evidence of how to reduce future damages to present value. The court refused to include a present value determination on the special verdict form. Plaintiff claims this prejudiced him because he was required to present his damage claim as one for damages in the range of $19 million to $150 million, affecting plaintiff's credibility with the jury. The court's ruling on a motion in limine is reviewed for abuse of discretion. (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456 [134 Cal.Rptr.2d 756].)

■ In medical malpractice cases, the trial court is required to enter an order that a defendant make periodic payments if the future damages awarded equal or exceed $50,000, if either party makes such a request. (Code Civ. Proc., § 667.7, subd. (a).) It is proper for the trial court to submit to the jury the issue of the gross amount of future damages, while retaining for itself the timing of periodic payments, and thus the present value. (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 649 [80 Cal.Rptr.2d 46, 967 P.2d 585].)

Plaintiff argues the battery claim was not subject to Code of Civil Procedure section 667.7. As discussed below, the battery cause of action had been removed from the case before it went to the jury, and therefore any error was not prejudicial.

Moreover, plaintiff could not have been prejudiced by the court's order granting the motion in limine, because the jury never reached the issue of

damages. The jury found Dr. Dugan not liable on either of the claims before it. Plaintiff argues he was prejudiced because the jury might have viewed the request for gross future damages as greed. This is speculative.

More importantly, the jury was instructed the court would make any necessary adjustments to the damages award to account for the present value of the damages. "As you may be aware, a sum of money to be received in the future, or to be spent in the future, can be expressed in terms of its 'present value.' The determination of the present value of a sum of money to be received or spent in the future requires a mathematical calculation. [¶] . . . Do not make any adjustment for the 'present value' of the future medical costs and future loss of earning capacity. If such an adjustment is legally required, the Court will perform the appropriate calculation."

## IV.

### THE TRIAL COURT DID NOT ERR BY GRANTING A NONSUIT ON THE BATTERY CLAIM; EVEN IF THE COURT SO ERRED, THE ERROR WAS NOT PREJUDICIAL.

### A. *The Issue*

Plaintiff sued Dr. Dugan for battery based on the administration of Ativan to Rey, alleging (1) Dr. Dugan failed to obtain Rey's parents' informed consent to treat Rey with Ativan, (2) the risks and dangers of Ativan were never explained to Rey's parents, and (3) Rey's parents had specifically forbade the use of any medication for Rey without their authorization.

After both sides rested their case at trial, the court granted Dr. Dugan's motion for nonsuit on the battery claim. In granting the motion, the court stated: "I couldn't find any evidence in the record here from which a reasonable jury could reach the conclusion that based upon this evidence, that this doctor treating this infant in the P.I.C.U. intentionally rendered a treatment that had not been consented to, or deviated from the scope of the consent. I think without any question the record here supports that Dr. Dugan is performing what he believes to be routine and appropriate standard of care treatment upon an infant that's been admitted and admitted pursuant to conditions of admission, which consent to the type of treatment that he's providing. . . . [¶] . . . [¶] . . . My granting of the motion is based upon my belief that the record does not have evidence from which a reasonable jury could find that Dr. Dugan intentionally rendered treatment that had not been consented to or intentionally deviated from treatment that had been consented to."

### B. *The Standard of Review*

■ "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.] [¶] In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) We may not, however, consider the supporting evidence in isolation, and disregard any contradictory evidence; rather, we must review the entire record. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 [47 Cal.Rptr.2d 752].)

### C. *Battery in the Context of Medical Treatment*

" 'A battery is any intentional, unlawful and harmful contact by one person with the person of another. . . . A harmful contact, intentionally done is the essence of a battery. . . . A contact is "unlawful" if it is unconsented to. . . .' [Citation.] The elements of a civil battery are: ' "1. Defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; [¶] 2. Plaintiff did not consent to the contact; [and] [¶] 3. The harmful or offensive contact caused injury, damage, loss or harm to the plaintiff." ' [Citation.]" (*Fluharty v. Fluharty* (1997) 59 Cal.App.4th 484, 497 [69 Cal.Rptr.2d 244].)

■ "Where a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery." (*Cobbs v. Grant, supra,* 8 Cal.3d at p. 239.) Consent is not necessary for medical treatment provided in an emergency. (*Id.* at p. 243.) When a physician obtains the patient's consent to a particular treatment and administers that treatment, but an undisclosed inherent complication with a *low* probability occurs, the

patient has a claim for negligence, not battery. "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." (*Id.* at pp. 240–241.)

### D. *The Conditions of Admission Form*

When Rey was admitted to Fountain Valley on May 20, his mother signed a conditions of admission form on his behalf. That form read in relevant part: "The undersigned consents to the procedures which may be performed during this hospitalization . . . , including emergency treatment or services, and which may include, but are not limited to laboratory procedures, x-ray examination, medical or surgical treatment or procedures, anesthesia, or hospital services rendered [Rey] under the general and special instructions of [Rey]'s physician or surgeon." Plaintiff claims this form "is simply informational" and does not constitute any type of consent to treatment. Because the conditions of admission form does not specify any particular treatment, the risks of that treatment, or alternative treatments, plaintiff argues it is a nullity for purposes of providing consent to treatment.

We disagree. The conditions of admission form provides general consent to treatment at Fountain Valley. Both doses of Ativan which are at issue fall within its language. The echocardiogram was a medical procedure rendered under the general and special instructions of Rey's physician, and the Ativan was a necessary part of that procedure. The second dose of Ativan following Rey's apparent seizure on May 21 was a medical treatment under the physician's instructions for the specific condition initially necessitating Rey's hospitalization—the seizure disorder.

To accept plaintiff's interpretation of the conditions of admission form would make it superfluous, and ignore the realities of medical care. That language covers the basic care and treatment provided to patients admitted to Fountain Valley. To obtain the consent of the patient, or his or her parent, for every dose of medication or every diagnostic or medical procedure would

prevent the medical personnel from ever being able to administer those treatments or perform those procedures.[4]

■ The fact the conditions of admission form includes a provision advising the patient the physicians are independent contractors and not employees of Fountain Valley does not change this analysis. A hospital's general consent form is obtained for the benefit of all medical personnel treating a patient, and those personnel are entitled to rely on the general consent. (*Keister v. O'Neil* (1943) 59 Cal.App.2d 428, 433, 436 [138 P.2d 723] [written consent " 'to the administration of whatever anaesthetics and the performing of whatever operations may be decided to be necessary or advisable' " was obtained by the hospital for the benefit of the surgeon and the surgeon could avail himself of it even though he was not the hospital's agent].)

### E. *Conditional Consent*

■ Although the conditions of admission form was a general consent to the treatment Rey received, that does not end the analysis because there was evidence Rey's parents placed an oral condition on the written consent. Even if a patient consents to treatment, if the patient places conditions on that consent, the physician may be liable for battery if he or she exceeds those conditions.

"As a general rule, one who consents to a touching cannot recover in an action for battery. [Citation.] Thus, one who gives informed consent to a surgery cannot recover for resulting harm under a theory of battery. [Citations.] However, it is well recognized a person may place conditions on the consent. If the actor exceeds the terms or conditions of the consent, the consent does not protect the actor from liability for the excessive act. [Citation.] [¶] The rule of conditional consent has been applied in battery actions against physicians and surgeons in California . . . . [Citations.] [¶] In the present case, [the plaintiff]'s claim of battery rested on the theory that although the operation was consented to, the consent was subject to a specific condition: only family-donated blood would be used. If [the plaintiff] could establish the existence of this condition and its breach by [the defendant physician], she would establish a battery." (*Ashcraft v. King* (1991) 228 Cal.App.3d 604, 609–610 [278 Cal.Rptr. 900], fn. omitted.)

"There are three elements to a claim for medical battery under a violation of conditional consent: the patient must show his consent was conditional; the

---

[4] The question whether permitting Rey to be admitted to Fountain Valley in his physical condition sufficed as consent by Rey's parents to the administration of both doses of Ativan is not before us.

doctor intentionally violated the condition while providing treatment; and the patient suffered harm as a result of the doctor's violation of the condition. [Citation.]" (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1269 [132 Cal.Rptr.2d 855].)

Certain evidence at trial supported plaintiff's contention that consent to Rey's treatment at Fountain Valley was conditional. Rey's mother testified she told the admitting person, two nurses, and Dr. Salcedo that Rey was not to be given any medication without her knowledge. Although there was other contradictory evidence (including Rey's mother's deposition in which she testified she told the hospital staff Rey was not to be given phenobarbital without her consent), for purposes of the nonsuit motion the trial court was required to accept the testimony most favorable to plaintiff—that Rey's mother told everyone she could that Rey was not to be given any medication without her approval.

Dr. Dugan argues he cannot be liable for battery because Rey's parents did not directly communicate to him the conditions of their consent. There was no evidence at trial that Rey's parents ever told Dr. Dugan not to give Rey any medication without their knowledge or consent; to the contrary, there was evidence Dr. Dugan never spoke with Rey's parents before Rey's cardiac arrest. Rey's patient chart did not contain the information his parents did not want him to receive any medication without their knowledge or consent, and there was no evidence the individuals to whom Rey's mother stated her conditional consent relayed that information to Dr. Dugan.

■ This case differs from any reported California case on conditional consent in the context of medical battery because it is undisputed (1) Rey's parents never informed Dr. Dugan directly of the alleged condition on their consent and (2) Dr. Dugan did not otherwise learn of the condition. Battery is an intentional tort. (*Cobbs v. Grant, supra,* 8 Cal.3d at p. 240; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 347, p. 437.) Therefore, a claim for battery against a doctor as a violation of conditional consent requires proof the doctor intentionally violated the condition placed on the patient's consent. (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc., supra,* 107 Cal.App.4th at p. 1269.) Dr. Dugan could not have *intentionally* deviated from the scope of the consent because he was unaware of any condition on that consent. There is no authority for imputing knowledge of Fountain Valley employees to Dr. Dugan on the claim for medical battery. Given the evidence, the jury could not have found Dr. Dugan had knowledge of Rey's parents' conditional consent, and therefore could not have found him personally liable for battery, an intentional tort.

After considering the evidence in the light most favorable to plaintiff, we conclude the trial court did not err by granting the nonsuit on the battery

claim. Although there was substantial evidence Rey's parents had conditioned their consent to treat Rey on their knowledge of all medications to be given to him, there was no evidence Dr. Dugan had actual knowledge of the condition and thus intentionally violated the scope of the consent.

### F. Did Any Error Prejudice Plaintiff?

Even if the trial court had improperly granted the nonsuit motion on the battery claim, any error was not prejudicial. Whether the failure to allow the jury to consider the battery claim was harmless in light of the jury's defense verdict on the informed consent claim depends on the extent to which the two claims were based on the same facts.

In *Traxler v. Varady* (1993) 12 Cal.App.4th 1321, 1326 [16 Cal.Rptr.2d 297], the plaintiff suffered a hemorrhage two weeks postpartum. The plaintiff signed a consent form authorizing her physician to perform a dilatation and curettage (D&C) procedure. (*Ibid.*) The physician estimated the plaintiff had already lost two pints of blood. (*Ibid.*) After the D&C, the plaintiff unexpectedly continued to hemorrhage, so the physician placed her under general anesthesia and performed a second D&C. (*Ibid.*) In the recovery room, another physician determined that because of the amount of blood loss, the possibility of further hemorrhaging, and the risks of a possible emergency hysterectomy, the plaintiff should be transfused with two units of blood. (*Id.* at pp. 1326–1327.) Because the plaintiff was still under the effect of the general anesthesia, the physician did not obtain her consent to the transfusion. (*Id.* at p. 1327.) Six years later, the plaintiff learned the blood with which she had been transfused had been tainted with HIV, and she tested positive for HIV. (*Ibid.*)

The plaintiff argued on appeal the trial court erred by failing to instruct the jury on a battery theory. (*Traxler v. Varady, supra,* 12 Cal.App.4th at p. 1333.) The plaintiff contended that her general consent to the D&C did not include consent to the transfusion, and her consent could not be implied because there was no emergency at the time of the transfusion. (*Ibid.*) The plaintiff's battery theory was based on the same facts as her cause of action for lack of informed consent. (*Id.* at p. 1334.) Because the jury found in favor of the physician defendants on the informed consent theory, the appellate court concluded the refusal to instruct the jury on battery was harmless. (*Ibid.*)

The court in *Traxler v. Varady, supra,* 12 Cal.App.4th at page 1334, distinguished *Ashcraft v. King, supra,* 228 Cal.App.3d 604, as follows: "The court [in *Ashcraft*] held that the jury verdict in favor of the surgeon on the informed consent theory did not support the conclusion that the refusal to

instruct on battery was not prejudicial because the 'jury could have found defendant adequately informed Ms. Ashcraft of all significant risks of the surgery, including the risk involved in blood transfusions, *before* obtaining her consent and still have found defendant liable for battery because he violated the conditional consent Ms. Ashcraft gave after being informed of those risks.' [Citation.] By contrast, in this case, appellant does not contend that she placed any conditions upon her consent. Instead, she contends that she did not give her consent, that her consent could not be implied, and that if she did give consent, it was not informed consent."

With respect to plaintiff's claim for lack of informed consent, the jury was asked in question No. 3 on the special verdict form, "Did [Dr. Dugan] disclose to [Rey's parents] all relevant information which would enable them to make an informed decision regarding the proposed treatment to be rendered by [Dr. Dugan]?" The jury responded in the affirmative. It was undisputed that Rey's parents never specifically consented to treatment with Ativan, either during the echocardiogram or following Rey's seizure. Therefore, the jury's verdict must mean it concluded specific consent to use Ativan was not needed because of the nature of the drug or the purpose of its administration, or because Rey's parents did not condition their consent on not using Ativan. In considering the battery claim, the jury would have considered whether Dr. Dugan intentionally disregarded the conditions on consent; in all other respects, the facts to be proven as to the claims for battery and informed consent were the same. Specifically, in deciding the informed consent claim, the jury would have considered whether Rey's parents consented to the treatment, whether Dr. Dugan's use of Ativan in treating Rey substantially departed from the consent, and whether Rey's parents placed conditions on their consent. (Jud. Council of Cal., Civ. Jury Instns. (2003–2004) CACI No. 530; BAJI No. 6.10.5.)

Accordingly, the jury would not have been able to find in plaintiff's favor on the battery cause of action given its verdict on the lack of informed consent cause of action. Thus, even if the trial court erred by granting the nonsuit, the error was not prejudicial.

## DISPOSITION

The judgment is affirmed. In view of the facts of this case as described in this opinion and in the interests of justice, the parties shall bear their own costs on appeal.

O'Leary, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied December 3, 2004, and appellant's petition for review by the Supreme Court was denied February 16, 2005.