Filed 9/19/13  Shanley v. Shanley CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DENISE GAIL SHANLEY, | D062551 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00150081-PR-TR-NC) |
| KIRK LEE SHANLEY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard G. Cline, Judge.  Affirmed.

Law Offices of Rosemary Leonard and Rosemary Meagher-Leonard for Plaintiff and Appellant.

Alspaugh & Alspaugh, George A. Alspaugh, Jr., for Defendant and Respondent.

Plaintiff and appellant Denise Shanley appeals the judgment entered after a bench trial.  She contends the trial court prejudicially erred when it (i) excluded the testimony of an expert witness she untimely designated to rebut a handwriting expert purportedly

designated by her cotrustee brother, defendant and respondent Kirk Shanley, that Kirk did *not* call as a witness at trial; (ii) ruled Kirk had preserved his objections to Denise's second accounting despite his failure to provide such pretrial objections in writing; and (iii) admitted for impeachment purposes both Denise's record of conviction and the factual statement supporting her guilty plea arising from her unlawful billing of a workers' compensation carrier for chiropractic services she rendered.

Denise also contends the court erred when it found (iv) she subsequently recouped nearly all of the funds she transferred without consideration to E.M. Kelly Shanley—the mother of Denise and Kirk (the decedent)—during the course of the criminal investigation against Denise; (v) she breached her fiduciary duty as a cotrustee of the trust; and (vi) there was no agreement between her and the decedent to acquire together a valuable piece of real property located in Carlsbad (Carlsbad property) in which title was in decedent's name only.

As we explain, we reject each of Denise's contentions and affirm the judgment in its entirety.

FACTUAL AND PROCEDURAL SUMMARY[1]

"Trial of the above matter came on regularly on May 21, 2012 before the Hon. Richard G. Cline, judge presiding. Denise . . . (hereafter "Petitioner") appeared personally and through her attorney . . . . Kirk . . . (hereafter "Respondent") appeared personally and through his attorneys . . . . The trial involved related issues concerning

---

[1] The factual and procedural summary is taken directly from the well-reasoned and detailed statement of decision of the court, which is set forth in full.

2

Petitioner's PETITION FOR ORDER FOR RETURN OF TRUST ASSETS etc.;

Respondent's PETITION TO DENY CREDITOR'S CLAIM OF COTRUSTEE etc.;

Petitioner's FIRST ACCOUNT CURRENT AND REPORT etc.; Petitioner's SECOND

ACCOUNT CURRENT AND REPORT etc.; and Respondent's COTRUSTEE KIRK

LEE HANLEY'S FIRST ACCOUNT AND REPORT etc. Prior to trial herein, each party

had filed a petition to remove the other as cotrustee. These latter two petitions were

resolved with the resignation of both Petitioner and Respondent as Cotrustees and the

appointment by stipulation of a private professional fiduciary. The parties presented oral

and documentary evidence and the argument of counsel. Prior to submission of the case,

Respondent presented a motion for judgment pursuant to Code of Civil Procedure section

631.8. The court deferred ruling on this motion and therefore took the entire matter

under submission. The court herewith sets forth its tentative decision on the issues

submitted to it.[2]

"BACKGROUND

"Petitioner and Respondent are the only children of E.M. Kelly Shanley (hereafter

"Decedent"). Decedent executed the E.M. Kelley Shanley Trust on April 30, 1985 and

amended and completely restated it on January 28, 1998. As amended the trust provided

that Petitioner and Respondent would serve as Cotrustees upon the death of Decedent.

---

2    As set forth *post*, the tentative statement of decision by its own terms became the
final statement of decision unless "within 10 days any party specifie[d] controverted
issues or ma[de] proposals not covered in the tentative decision." The record shows
judgment was entered based on the final statement of decision after no party objected to
the court's tentative statement of decision.

3

They were required to act together. The trust estate was to be divided equally into two shares and distributed one share each to Petitioner and Respondent.

"Decedent was a sophisticated real estate investor who was active until her death on August 30, 2007. At the time of her death, her assets consisted of . . . several automobiles, bank accounts, miscellaneous personal property and residential properties located at 410 Alvarado Terrace in Vista, 3596 Emma Lane in Vista and 5420 Carlsbad Blvd in Carlsbad. The latter is a very desirable and valuable piece of property overlooking the Pacific Ocean. Each of the properties had multiple units that could be rented. Prior to her death, Decedent actively managed all of the properties. Petitioner provided some assistance in regards to business matters whereas Respondent regularly provided significant labor and expertise with regard to the maintenance of the properties.

"Upon the death of their mother, the parties continued to utilize Decedent's attorney and accountant to handle some of the estate matters. They also began to exert control over specific property. Petitioner took charge of the Carlsbad property, where she resided part time. Respondent began to take control over the two Vista properties. For over a year there was some talk but no agreement between Petitioner and Respondent about filing the necessary tax returns and dividing and distributing the trust estate. Tension began to develop as each accused to [*sic*] other of withholding information needed for the tax returns. Also, the parties could not agree upon the division. As a result, there was no action to make the required division and distribution. At some point, Decedent's attorney withdrew from further representation. By the summer of 2008,

4

tension was increasing significantly between Petitioner and Respondent. Petitioner had taken charge of having the 706 Federal Estate Tax Return prepared. She demanded records and information from Respondent. Petitioner was not satisfied with the information she received. Respondent made demands upon Petitioner for information regarding the Carlsbad property. He was dissatisfied with the responses he received. By about August 2008, Petitioner and Respondent entered into a more formal agreement whereby Petitioner would manage the Carlsbad property and Respondent would manage the Vista properties. But there was a lack of agreement or misunderstanding as to what information each of them would report to the other. The relationship essentially reached the breaking point when on October 31, 2008 Petitioner sought a domestic violence restraining order against Respondent for allegedly threatening her life. Among other relief, Petitioner requested that the court make the following orders: 1) dismiss Respondent as cotrustee of the subject trust; 2) order Respondent to pay the trust $20,000.00 in rental income that he had misappropriated; and 3) award Petitioner control over the Carlsbad property. On November 19, 2008 the court dismissed Petitioner's domestic violence petition with prejudice and awarded Respondent $3500.00 in attorney's fees. The present trust proceedings commenced on January 20, 2009 when Petitioner filed a safe harbor petition under Probate Code section 21320 et seq. Subsequently, the parties filed the remaining petitions and accountings.

5

"Petitioner claims that she owns three-quarters of the Carlsbad property. She presented evidence to support her claim that she and her mother entered into an agreement to acquire the property as equal partners. Petitioner alleges she individually acquired a one-half interest with Decedent owning the other half as trustee of the subject trust. Upon the death of Decedent, Petitioner acquired half of her mother's share. Petitioner presented evidence that she contributed money at various times in the total sum of $367,364.00 towards purchase or maintenance of the Carlsbad property. She claims this was the agreed consideration for her half interest.

"Respondent denies that Petitioner and Decedent entered into an agreement to purchase the Carlsbad property jointly. He further claims that such an agreement, even if it existed, is barred by the statute of frauds. Further, Petitioner is unable to meet the high hurdle of proof of an oral agreement by clear and convincing evidence.

"Petitioner claims that Respondent violated his duties as cotrustee in numerous respects. In particular, he misappropriated rental income from the Vista properties and has failed to properly account. Petitioner seeks sanctions, double damages, and other relief. Respondent denies the foregoing and asserts that his acts were reasonable and appropriate and that his accounting should be accepted.

"Petitioner has filed two accountings that she claims accurately and completely portray her activities as cotrustee, particularly with respect to the Carlsbad property.

6

Respondent objects to the accountings, principally insofar as they purport to justify Petitioner's claim to a three-quarter interest in the Carlsbad property.

"Each party seeks a variety of relief against the other including surcharges and attorneys' fees.

"CREDIBILITY OF THE PARTIES

"The credibility of both parties is severely compromised. This has made it difficult to believe either party unless there was significant objective corroboration. It was evident that each party has extreme animosity for the other. Their handling of their trustee responsibilities has been driven by this animosity and by the desire to obtain a personal benefit from the Decedent's trust to the detriment of the other beneficiary. Each ignores the fact that the other was a beneficiary and cotrustee to whom fiduciary duties were owed.

"Sometime in early 2004 the authorities began investigating Petitioner for criminal conduct related to the operation of her chiropractic practice. She was arrested on or about June 24, 2004. On February 10, 2005 Petitioner entered a change of plea to a charge involving moral turpitude. As part of the plea bargain, Petitioner admitted that:

> "'I billed . . . Workers' Compensation Carrier for office visits for treatments or evaluation which did not occur on the dates billed. I did this knowingly, unlawfully, and with the intention of making these false and fraudulent claims, the total of which were over $400.00.'

7

"At the time this criminal case was pending, Petitioner owned a building free and clear in Solana Beach where she maintained her practice. She also had tens of thousands of dollars in liquid assets. On September 23, 2004, Petitioner signed a quitclaim deed transferring the office to Decedent's trust. This deed recorded on February 16, 2005. She also transferred substantial cash to various trust accounts. These transfers were without consideration. On February 10, 2005 and on July 1, 2005 [Petitioner] signed Financial Statements under penalty of perjury. These were provided incident to the probation granted to Petitioner in the criminal case. The documents on their face indicate that the information was to be considered relative to the question of whether 'you (Petitioner) have the present ability to repay probation costs.' In each, Petitioner declared under penalty of perjury that 'this is a full and true statement of my assets and obligations. . .' Neither financial statement contained any reference to the money or the Carlsbad property that Petitioner had transferred to Decedent without consideration. The court finds that the financial statements were false in that material information was omitted. This omission was intentional and for the purpose of misleading the authorities in connection with the determination of whether Petitioner had the ability to repay the costs of probation. In sum, the court finds that Petitioner engaged in willful and intentional fraud in connection with the preparation of the two financial statements.

"Respondent presented two impeachment witnesses who opined about the credibility of Petitioner. Adam Fogelman, D.C. practiced chiropractic medicine for a few months with Petitioner. He stated that Petitioner was untrustworthy. Further, Dr.

8

Fogelman stated Petitioner had improperly placed his initials on patient documents that he did not sign. Ciceli Roy had strong opinions about Petitioner: she was not honest, she committed fraud; she would steal; and she was not trustworthy.

"Petitioner's testimony is also rendered suspect by her actions regarding an amended Form 706 Estate Tax Return that she executed on November 28, 2011. Petitioner prepared and filed this document without the input, consent or knowledge of her cotrustee brother. This occurred during the course of litigation when Respondent was represented by counsel and Petitioner should have known that her actions as cotrustee were under the microscope. This document was signed solely by Petitioner in her capacity as executor. It shows a reduction of the value of the gross estate based upon several factors. First, Petitioner alleges she received a gift from Decedent on 8/13/07 in the sum of $217,314.00. Second, it shows a creditor's claim in the sum of $437,922.00 with Petitioner individually named as the creditor. It appears that Petitioner attempted to place herself in the position of receiving a tax refund in the sum of $331,006.00 without the knowledge of Respondent. Having in mind the animosity between the parties and Petitioner's deficits in character, it is highly probable that Petitioner was intentionally putting herself in a position where she could defraud her brother of his share of the tax refund. Also, in filing this return unilaterally, she violated the terms of the trust which required her to act jointly with Respondent.

"Respondent likewise suffers a credibility disability. As discussed hereafter, Respondent violated multiple fiduciary duties in connection with his handling of the

9

income from rental of trust property located in Vista and also his charges for trust expenses. His accounting was an after-the-fact effort to justify improper deeds.

"DISCUSSION

"**What is the extent of Petitioner's ownership interest in the Carlsbad property?**

"There was no deed transferring any portion of the interest in the property to Petitioner. There was no written agreement for joint ownership between Petitioner and Decedent. Finally, title to the property at the death of Decedent showed that the trust owned the Carlsbad property. These facts necessarily implicate the statute of frauds contained in Civil Code § 1624(a) which bars oral claims for the sale of real property unless the sale is documented by a sufficient memorandum. They also implicate the rule that ownership is presumed to follow record title unless shown otherwise by clear and convincing evidence (Keene v Keene (1962) 57 C.2d 657).

"Petitioner testified to an agreement she and Decedent had to jointly purchase and manage the Carlsbad property as equity partners. She points to various checks and expenditures she allegedly made in furtherance of the partnership agreement. In particular she relies upon a check for $57,900.00 which she paid into the escrow that handled the acquisition of the Carlsbad property and which closed on March 4, 2004. Petitioner also introduced evidence in the form of records of transactions involving several financial accounts in the additional sum of about $310,000.00 that purportedly represented the balance of the consideration paid by Petitioner for her interest in the property. Finally, Susan Nancarrow, Todd Lenhoff and R. Moore testified as to their

10

recollection of conversations wherein Decedent discussed her intention to buy the Carlsbad property with Petitioner.

"Petitioner's evidence is unpersuasive for several reasons. Firstly, the documents supporting Petitioner's claim are somewhat ambiguous. The relevancy and import of the documents was supplied almost entirely by Petitioner. As indicated, she is lacking in credibility. The testimony of R. Moore was based in large part upon two documents he signed in August and October 2008. The witness relied heavily upon these documents to refresh his recollection of the events set forth in them. These documents, and the testimony of Mr. Moore are undermined by the fact that the Petitioner requested that Mr. Moore prepare the documents and she supplied him with suggested contents. The testimony of the other witnesses was of limited help to Petitioner because they testified to an agreement that Decedent **intended** to enter into with Petitioner. An additional fatal flaw in the evidence is that it fails to establish the material terms of the alleged agreement, the fact that it ever went into effect, and that it was not rescinded by mutual agreement.

"Respondent, on the other hand, presented substantial evidence rebutting Petitioner's claim that there was an agreement with respect to the Carlsbad property. Particularly compelling is a memorandum in the handwriting of Decedent dated November 27, 2005 that clearly repudiates the notion that the agreement to purchase actually went into effect. Also, the court considered a notarized but unrecorded quitclaim deed signed by Decedent on December 30, 2004 that purports to transfer the subject

11

property one-quarter to Petitioner, one-quarter to Respondent and one half to the subject trust. This is compelling evidence of Decedent's intent that is contrary to the claim of an agreement. Finally, Respondent presented William Sturgeon, a certified public accountant, who testified regarding many of the financial transactions of Petitioner regarding the Carlsbad property. He analyzed the various trust accounts, joint tenancy bank accounts and certificates of deposit used by Petitioner and Decedent. He concluded that Petitioner had been reimbursed all but $2871.02 of the $367,000.00 she claims as contributions towards the purchase of the Carlsbad property. If Mr. Sturgeon's testimony is to be accepted, Petitioner is in the position of claiming she paid $2871.02 for a one-half interest in the Carlsbad property whereas Decedent contributed over $1,000,000.00. The evidence Petitioner relies upon to contradict the testimony of Mr. Sturgeon is her own explanation of the records of the particular transactions. Mr. Surgeon is much more credible than Petitioner. The court rejects the claim of Petitioner.

"The court finds that there was no enforceable and valid agreement between Petitioner and Decedent to jointly acquire the Carlsbad property in equal shares. The ownership of the Carlsbad property is as shown by record title; that is, the subject trust is the owner of the property. Petitioner and Respondent are equal beneficiaries of the trust. Further, Petitioner has been reimbursed all but $2871.02 of the $367,000.00 she contributed to the Trust or for the Carlsbad property.

12

"**Does Petitioner have a valid creditor's claim against the trust in the sum of $367,364?**

"Petitioner presented evidence that she had *invested* $367,364.00 in the Carlsbad property. She presented a claim form dated August 26, 2008 wherein she, as trustee, approved the creditor's claim in that sum plus interested for a total of $437,922.00. Petitioner attached this claim to the Federal Estate Tax Return form 706 she signed and submitted unilaterally to the IRS on December 1, 2008. Respondent denies the validity of the creditor's claim on the merits. He also asserts that the claim is barred by the statute of limitations. Petitioner responds to this issue in her Opposition to Petition to: Deny Creditor's Claim etc. filed on January 7, 2011. She states that her 'claim' is a claim under Probate Code § 850 for return of specific property, to wit: specific bank accounts. It falls within the exception to creditor's claims found in P.C. § 19000(b) and, therefore, is not a 'creditor's claim.' Further, the evidence shows that she reimbursed $229,314.05 from Washington Mutual account #. . . 403-5. She seeks an order that she be allowed to retain these funds rather than returning them to the trust.

"As noted previously, the terms of the trust required the cotrustees to act together. In the case of this particular 'creditor's claim,' the evidence was unclear whether or when Petitioner ever notified her cotrustee brother of the nature and existence of her claim. It is clear that Respondent never approved the claim. Absent compliance with the terms of the subject trust, Petitioner's purported unilateral approval of the claim was ineffectual. Accordingly, on the merits, Petitioner's claim is not an approved creditor's claim.

13

Secondly, at trial petitioner presented evidence consistent with her position stated in the above Opposition to Petition etc. That is, she sought a determination that the money in the accounts in question was either hers or was her contribution to the partnership with her mother to acquire the Carlsbad property. Further, she actually reimbursed herself part of this money. In view of the position taken by Petitioner, she is stopped to claim that she had a valid and approved creditor's claim in the sum of $437,922.02 or any other sum.

**"Is Petitioner entitled to return of any funds in specific trust accounts?**

"As stated above, Petitioner claimed in her Opposition to Petition to Deny Creditor's Claim etc. that she reimbursed herself for $229,3[1]4.05. Evidence supports this claim. Further Mr. Sturgeon testified without any significant contradiction that Petitioner was reimbursed for all but about $2871.02 that she contributed to the trust for the Carlsbad property. She identified no specific trust account or fund to which she was entitled. Therefore, the court finds that Petitioner is not entitled to the return of any specific money or item of property held by the trust. In particular, Petitioner is not entitled to the return of $2871.02.

**"To what extent did the parties perform their fiduciary duties as cotrustees?**

"Each of the parties seeks relief based upon the general contention that the other did not perform his/her fiduciary duties. In light of the equitable nature of the proceedings and the relief sought, it is proper to consider the extent to which each party performed the duties of a trustee set forth in Probate Code §§ 16000 et. seq.

14

"The most obvious duty of a trustee is to administer a trust according to the provisions of the trust instrument (P.C. 16000). Among the important terms of the trust are the requirements that the cotrustees act together and that upon the death of the Decedent the cotrustees divide the estate and distribute it in equal shares to Petitioner and Respondent. In the performance of the duties of cotrustees, the parties are obligated to exercise reasonable care and skill (P.C. 16040). The court finds that neither party reasonably cooperated with the other. Further, although there have been discussions and arguments over distribution of the trust assets, both parties have failed in their duties to divide and distribute the trust assets within a reasonable time.

"A trustee has a duty to be impartial as between beneficiaries (P.C. 16003) and to avoid conflicts of interest (16004). In the present case, both Petitioner and Respondent acted principally for their individual benefit and to the detriment of the other. Petitioner took control of and managed the Carlsbad property for her own purposes and with the aim of obtaining an advantage over Respondent. Respondent took control of and managed the Vista properties for his own purposes and with the aim of obtaining an advantage over Petitioner. For example, Respondent used the rents from the Vista property as if it was his alone. He spent this money without any consideration for the cash needs of the trust. Petitioner manipulated trust accounts and tax returns in order to support her claim to a half interest in the Carlsbad property. In summary, both parties violated the above described duties.

15

"A trustee has a duty to keep trust property separate (P.C. § 16009). Respondent deposited part of the rental receipts and took the balance as cash. Much of the bank deposits went into a trust account maintained by Respondent and his wife but as to which Petitioner had no access. Respondent used some of this money for person[al] or non-trust purposes. The court finds that Respondent improperly commingled his personal money and trust money in violation of the above fiduciary duty. Petitioner performed her duties no better. The evidence was clear that Petitioner and Decedent connived to hide Petitioner's assets from the probation department and others. Petitioner accomplished this by transferring her office and liquid assets to the trust. After the death of Decedent, Petitioner continued to carry in the trust property she claimed personally. This is a clear violation of the above fiduciary duty.

"Related to the duty to keep property separate and avoid commingling is the duty to keep records sufficiently complete and accurate to explain transactions. Where the trustee fails to keep adequate records, there is a presumption of fraud (Blackmon v. Hale (1970) 1 C3d 548, 560). Respondent did not create any type of trust ledger or organized method for recording expenditures for trust purposes. Instead, Respondent retained and ultimately produced a series of receipts. The purpose of many of the expenses is unclear. Also, the source of the payment of many of the expenses is unclear. Respondent testified that he paid many of the expenses from cash or advanced money from his personal accounts. He testified that all of the claimed expenses were for proper trust purposes. Unfortunately, there is a considerable amount of rental income or cash that Respondent is

16

unable to account for directly. Respondent claims this unaccounted for money as trustee's fees.

"Petitioner presented credible evidence that Respondent's questionable draws or expenses total $66,068.37. Also, the evidence showed that Respondent engaged in the foregoing course of conduct for a considerable period. But, in so doing, he violated his duty to keep trust property separate (P.C. § 16009).

"Respondent and his wife established trust bank accounts using a name similar to the trust in question. He deposited income from the Vista properties into this account. Petitioner had no access to these accounts and was not provided with information regarding them. In creating and using these accounts in the manner he did, Respondent violated his duty to avoid adverse trusts (P.C. 16005) and his duty to work jointly as a cotrustee with Petitioner.

"The cotrustees have a duty to take control of and to preserve trust assets (P.C. 16006). Almost five years after the death of Decedent, the cotrustees have taken no steps to dispose of or distribute three motor vehicles, a Matrix, a Buick and a mint condition Mustang. While each of the parties appears to have control over one or more vehicles, the status of these assets is uncertain. In view of the fact that these are depreciating assets, the failure of the two parties to dispose or distribute the assets is a violation of the above duty.

"A trustee has a duty to keep beneficiaries informed of matters relating to the trust administration (PC16061). The duty of cooperation that exists between two cotrustees

17

also includes the duty to share information.  Since each party is both a beneficiary and a trustee, each is effectively subject to two duties to provide information to the other regarding the property and money under their respective control.  Respondent used the income from the Vista properties for various personal purposes without informing Petitioner, a beneficiary, of his actions.  He also failed to provide requested information to Petitioner until he was forced to.  In view of the foregoing, the court finds that Respondent violated his duties as described above.  Petitioner failed to keep Respondent informed of all relevant dealings with respect to the Carlsbad property.  She also concealed some material activities with regard to the filing of the Federal Estate Tax Return form 706 and her efforts to obtain a tax refund.  In so doing, she also violated the above-described duty to provide information.

"In summary, each of the two parties is guilty of intentionally violating multiple duties as a cotrustee.  Each grossly failed to act with the requisite care in the management and administration of the trust.  Each acted for his/her personal interest with the intention of obtaining a personal benefit to the detriment of the other.

"**Should respondent's accounting be approved?**

"Respondent filed his First Account and Report on March 11, 2011.  Prior to this filing, Respondent provided Petitioner with informal accountings.  Petitioner objects strongly to the accounting and seeks a variety of relief including a surcharge against Respondent.  Petitioner objects most strenuously to Respondent's handling of rental income.  The evidence showed clearly that Respondent did not deposit all rental receipts.

18

It also shows that he did not record the use of rental income for legitimate trust expenses such as maintenance or upkeep of trust property. The court finds that the accounting is inadequate; it does not balance. Respondent's accounting attempts to plug the balance by claiming unjustified or unexplained draws or missing income as fees. This is unacceptable. The accounting should not be approved.

"The court allows but does not approve the expenses of Schedule E in the sum of $7,915.72 as a proper charge against the trust.

"Respondent's claim for additional fees as an offset against unexplained cash withdrawals or advances is denied. Respondent is surcharged in the sum of $65,638.10 to be paid from his distributive share of the trust. His prior payment of $15,000.00 as fees, matched by a similar withdrawal by Petitioner is allowed. The remainder of the reported transactions are allowed but not approved.

"**Should the accountings of Petitioner be approved?**

"Petitioner filed her Second Account and Report etc. on January 12, 2011 covering the period July 1, 2010 through December 31, 2010. Respondent never filed any specific objections to this account. The failure to file objections was not brought to the attention of the court until the case was called for trial. In the interim, the matter has been on calendar numerous times with the court minutes indicating generally that all pending matters were contested. At commencement of trial, Petitioner brought a motion in limine to prevent Respondent from objecting to the accounting at trial. The court denied that motion. The court notes that Respondent produced William Sturgeon as an expert

19

witness on certain financial issues relating to the Carlsbad property. Although undoubtedly qualified to do so, Mr. Sturgeon did not testify as to Petitioner's accountings per se. The Respondent presented evidence challenging Petitioner's claims to the Carlsbad property but did not otherwise challenge the schedules of receipts or disbursements or the other details of the accounting. Accordingly, the court's review of Petitioner's second account will focus upon the financial transactions with respect to the Carlsbad property and her actions related to those transactions.

"As indicated above, Petitioner has failed to administer the trust with the proper care or in conformity with her fiduciary duties. Since those duties are the underpinnings of the transactions reported, her accounts should not be approved. However, the accountings and reports are allowed except with respect to the transactions affecting ownership discussed elsewhere in this decision. More particularly, the fees taken in the sum of $15,000.00 are allowed. Petitioner's report on the failure of Respondent to pay his one-half share of the estate taxes in the sum of $17,500.00 is allowed. Respondent is surcharged in that sum.

## "**Should Respondent be liable for forgery of a check in the sum of $6000.00?**

"Petitioner alleges that Respondent forged the signature of Decedent on a check in the sum of $6000.00. Although the circumstances of the preparation and delivery of that check are suspicious, Petitioner failed to meet her burden of proof on this issue. Therefore, the court finds that Respondent shall not be liable on this claim.

20

"**How should the liability or benefits of the filing of the Federal Estate Tax Return be apportioned?**

"As previously discussed, Petitioner undertook to file the tax return and amended return on her own. It is possible that the trust could be subject to some liability or penalty for improprieties related to these returns. If there is any wrongdoing or liability incurred, it is fair that Petitioner bear that liability personally. However, if there is a refund due, it is fair and appropriate that the benefit be shared equally by the parties. Accordingly, Petitioner shall indemnify and hold Respondent, the successor trustee and the trust harmless from any liability with respect to the above tax returns. Any refund shall be divided equally between the parties.

"**Should the court award either party double damages or punitive damages?**

"In view of the failure of either party to properly perform his/he[r] fiduciary duties, it would be inequitable to award either party double damages or punitive damages. Therefore, this claim should be denied.

"**Attorneys' fees and costs.**

"Each side shall bear his or her own attorneys' fees and costs.

"**Good cause appearing, it is ordered:**

"1.     Petitioner's motion for judgment is denied.

"2.     The trust is the sole owner of the Carlsbad property.

"3.     Petitioner has no valid or enforceable creditor's claim.

21

"4.     Petitioner is not entitled to be reimbursed any additional sum for money advanced to or paid for or in connection with the Carlsbad property.

"5.     Respondent is surcharged the sum of $65,638.10 for his failure to account for rental income, which shall be a charge against his distributive share of the trust. Respondent is surcharged the sum of $17,500.00 for his one half of the estate taxes that he failed to pay.  In the event of a tax refund or other tax adjustment, the successor trustee shall adjust the tax liability of Petitioner and Respondent so that they are equally responsible.  Respondent is allowed as a proper charge against the trust the sum of $7,915.72 for the expenses shown on schedule E of his accounting.  The accounting of Petitioner is otherwise allowed but not approved.

"6.     Petitioner shall indemnify and hold Respondent, the successor trustee and the trust harmless from any liability with respect to the Federal Estate Tax Return, as amended[,] that she filed.  Any tax refund shall be divided equally between the parties.

"7.     The accounting of Respondent is otherwise allowed but not approved.

"8.     The requests of the parties for additional damages, double damages and punitive damages are denied.

"9.     The request of each party for attorneys' fees is denied.  Each side shall bear his/her own attorneys' fees and costs.

"10.    The parties have otherwise failed to establish their claims and defenses.

        "This is the tentative decision of the court.  Counsel for Respondent[] shall prepare the proposed judgment and any related orders.  This tentative decision will be the final

22

statement of decision unless within 10 days any party specifies controverted issues or makes proposals not covered in the tentative decision."

The record establishes no party objected to the tentative statement of decision, and it became the judgment of the court.

## DISCUSSION

A. *Exclusion of Denise's Rebuttal Expert*

1. Additional Background

The record shows the court in this case never set dates for the parties to exchange expert witness designations and reports. The record further shows neither party made a formal demand under Code of Civil Procedure section 2034.010 et seq. for exchange of expert witness information.

In the parties' joint trial readiness report filed in January 2012 (readiness report), Kirk named three experts as witnesses: William M. Sturgeon, CPA; Steven Paull and Manny Gonzales. Denise did not identify any experts as witnesses. She did, however, object to Kirk's experts on the basis the experts "were not previously designated."[3]

---

[3] Denise in her opening brief notes that Kirk in a previous "report" designated William Sturgeon as an expert witness. It is not clear what "report" Denise is referring to because there is no citation to the record regarding any such report. Along these same lines, we note that Denise's opening brief repeatedly cites to pages 591-601 of the appellant's appendix in connection with the parties' readiness report and her opposition to the expert designations by Kirk in that report. However, pages 591-601 of the appellant's appendix (even as amended by the errata to the appendix filed by Denise) has nothing to do with the readiness report or the expert witness issue raised by Denise. Instead, these are pages from a portion of Kirk's lengthy trial brief. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [a brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

At a February 2012 hearing in connection with the readiness report, the parties disputed whether Kirk had properly designated his expert witnesses. Kirk contended, as he does in this appeal, that his experts were properly designated. Denise disagreed. The court set the matter for hearing for early April 2012 and, in order to give the parties sufficient opportunity to resolve all discovery disputes including the dispute over experts, set trial for late May 2012.

At the April 2012 hearing, Denise informed the court she did not file a motion seeking to prevent Kirk from calling his experts because she claimed the parties informally had resolved their "expert witness issue." According to Denise, Kirk in a February 10, 2012 letter stated he was confident that his experts would be allowed to testify and also allegedly[4] stated he was "'not adverse to allowing [her] to identify [a] rebuttal expert. . . .'" Kirk disputed the parties had resolved the expert designation issue.

Denise at the April 2012 hearing made clear that she did not object to Kirk's alleged "late" designation of experts as long as she in response could designate a "rebuttal handwriting expert," whom she identified as Sandra Homewood. Denise noted she did not want to spend any additional "court time" on the expert issue, the parties agreed "experts [could] be designated at this point" and she reiterated she "simply" wanted to

_____

4       We say "allegedly" because the record cite by Denise to the February 10, 2012 letter is to pages 591-601 of her appellant's appendix, the *same* 11 pages she cited to and relied on in discussing the readiness report of the parties which, as we noted *ante* in footnote 3, is actually a portion of Kirk's trial brief that has nothing to do with the expert issue.

"designate a rebuttal handwriting expert." The court ruled to "leave the expert issue to the time of trial."

The expert witness issue next was the subject of a motion in limine by Kirk.[5] Denise opposed that motion and, in so doing, again noted she did not file a motion in connection with the April 2012 hearing because, in her view, the parties had previously agreed "to stipulate to the designation by Denise . . . of a rebuttal expert." Denise included in her opposition several letters between the parties on this issue.

As Denise represented at the hearing in April 2012, the record shows Kirk in February 2012 sent a letter to Denise stating in part that he would be willing to stipulate to allow Denise to "identify rebuttal experts in the present matter." Following the April 2012 hearing in which Kirk stated the parties had not resolved their expert dispute, Denise sent Kirk a letter that included a proposed stipulation allowing her to designate Sandra Homewood as an "expert in rebuttal." Kirk responded by letter dated April 16, 2012, stating he would not stipulate to allow Denise to designate a rebuttal expert because more than two months had passed since his February 2012 letter and because his offer "was not meant as an open invitation for you to designate rebuttal experts up to and including at the time of trial."

Denise argued in her opposition to the motion in limine that under Code of Civil Procedure section 2034.310, subdivision (b), she should be allowed to call a rebuttal

[5] Kirk's motion in limine does not appear to be part of the appellate record. (See Cal. Rules of Court, rule 8.204(a)(1)(C).) In any event, he notes his motion in limine on this issue "utilized the same legal authority as provided in his Response/Opposition" to the April 2012 hearing, which *is* part of the record.

25

expert at trial if that "expert is called as a witness to impeach the testimony of an expert witness offered by any other party at the trial." She also argued Kirk should be bound by their alleged agreement allowing her to call her handwriting expert as a rebuttal witness.

At oral argument on Kirk's motion in limine, the record shows Denise again made it clear that she intended to call Ms. Homewood only "as a rebuttal witness if necessary and we would like to reserve the time to argue that she is appropriate as a rebuttal witness if we need her." The court subsequently granted Kirk's motion because there was not a "timely or proper designation of Ms. Homewood" by Denise.

As noted *ante*, from the statement of decision, William Sturgeon testified as an expert witness for Kirk regarding "many of the financial transactions of [Denise] regarding the Carlsbad property." However, significant to the issue before us, Kirk did *not* call his handwriting expert, Manny Gonzalez, to testify at trial. It also does not appear that Kirk used or relied on at trial any expert information, including a report prepared by Gonzalez.

2. <u>Analysis</u>

The parties disagree whether Kirk could properly designate his experts in the readiness report. Kirk contends because the court never set dates for the parties to exchange expert witness information and because neither he nor his sister Denise invoked the statutory procedures set forth in Code of Civil Procedure section 2034.210 et seq. for the exchange of such information, by "default" a party may disclose experts in their joint

trial readiness report. Kirk relies on rule 4.22.8 of the San Diego County Superior Court Rules (Division IV -- Probate) to support this contention.[6]

Denise disagrees. She notes Kirk's designation of experts in the readiness report in any event was incomplete (e.g., no disclosure of the experts' qualifications and of the subject matters on which the experts were to testify) and, as such, under Code of Civil Procedure section 2034.300, he could not object to her untimely designation of a rebuttal handwriting expert.[7]

---

[6]     When the case was tried in 2012, rule 4.22.8(A) of the San Diego County Superior Court Rules provided: "Unless dispensed with by the court at the Case Management Conference, no later than five days prior to the trial readiness conference, counsel must meet and confer in person to prepare in good faith a Trial Readiness Conference Report/Advance Trial Review Order. The Trial Readiness Conference Report/Advance Trial Review Order shall be in the format set forth on CIV-252 which can be viewed under the Civil Forms Section of the San Diego Superior Court's website, www.sdcourt.ca.gov." CIV-252 as referenced by rule 4.22.8(A) is a "Joint Trial Readiness Conference Report" form. Section I of this form pertains to witnesses, and provides: "List the names of all witnesses, including experts, as follows: (Note: Previously exchanged expert witness designation documents must be attached to the report. Witnesses used solely for impeachment need not be listed.)"

[7]     Code of Civil Procedure section 2034.300 provides: "Except as provided in Section 2034.310 and in Articles 4 (commencing with Section 2034.610) and 5 (commencing with Section 2034.710), on objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following: [¶] (a) List that witness as an expert under Section 2034.260. [¶] (b) Submit an expert witness declaration. [¶] (c) Produce reports and writings of expert witnesses under Section 2034.270. [¶] (d) Make that expert available for a deposition under Article 3 (commencing with Section 2034.410)."

27

Although we are quite skeptical of Kirk's contention that he properly designated his expert witnesses in the trial readiness report,[8] we need not resolve that issue here because we conclude the court's ruling excluding Denise from calling a *rebuttal* expert had no bearing whatsoever on the outcome of the trial because, as noted *ante*, Kirk never called his handwriting expert to testify at trial. As such, Denise had no need to call Sandra Homewood as a rebuttal expert.

On appeal, Denise contends the court's ruling excluding Sandra Homewood as an expert allegedly had "devastating consequences" on her case because this expert "would have unquestionably established that Kirk had forged, or directed the forgery of, the Decedent's signature" and, as such, "she was unable to meet her burden of proof on this issue . . . ." This contention is unavailing.

First, because Kirk's handwriting expert did not testify at trial, as we have noted, the issue of whether the court erred in excluding her *rebuttal* expert is moot.

Second, to the extent Denise now contends she intended to call Sandra Homewood as an expert for purposes other than to provide rebuttal testimony (i.e., on the $6,000 forgery issue), we conclude she has not properly preserved the issue on appeal. (See *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-800 [noting"'"[t]he

---

[8] Indeed, the rule proposed by Kirk would actually defeat or, at a minimum, significantly undermine a key policy behind the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.) of "safeguard[ing] against surprise" (see *Beverly Hospital v. Superior Court* (1993) 19 Cal.App.4th 1289, 1294), as it would encourage parties not to follow the detailed statutory discovery procedures developed by our Legislature with respect to the designation and discovery of expert witnesses (see *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 951) but instead wait until the eve of trial and merely include the names of the party's or parties' experts in a trial readiness report.

rule that contentions not raised in the trial court will not be considered on appeal is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law,'"" and noting if the rule was otherwise, "'opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources "to address purported errors which could have been rectified in the trial court had an objection been made"'"].)

Third, the record shows Denise had ample opportunity to seek relief for her untimely designation of expert witnesses but did not avail herself of that opportunity. (See *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107 [noting the defendant's motion for relief under Code Civ. Proc., § 473, subd. (b) for untimely designating expert witnesses was properly granted].)

For these reasons, we reject Denise's contention the court erred, much less prejudicially, when it ruled Sandra Homewood could not testify as Denise's handwriting expert.

B. *Kirk's Objections to the Second Accounting*

1. Brief Background

Denise moved in limine for a determination Kirk waived any objection to the second accounting she filed in mid-January 2011.[9] Denise contended under rule 4.22.4

---

[9] Kirk also did not provide written objections to the first accounting filed by Denise in late-August, 2007. The first accounting is not at issue in this proceeding, however.

of the San Diego County Superior Court Rules (Division IV -- Probate) (rule 4.22.4)[10] that Kirk's failure to timely object in writing to the second accounting waived any such objection and that she would be prejudiced if the court allowed Kirk's objection to that accounting to stand on the eve of trial.

During oral argument on Denise's motion, the trial judge noted that he had taken over the case from another judge who treated the second accounting as contested by Kirk and as part of "one major controversy" between the parties.[11] The court also noted that although there had been multiple hearings between the parties since Denise filed her second accounting, she had waited until trial commenced to claim Kirk waived his objection to that accounting. The court found under the circumstances that Kirk did not waive his objection to the second accounting.

---

10   At the time of trial, rule 4.22.4 provided: "A person with standing may appear and object orally at the first hearing on any matter before the Probate Court. Thereafter objections, including grounds of opposition, to any petition or other pleading filed in Probate Court must be set forth in writing, filed and served either as required by statute or, in the absence of specific statutory requirements, by 4:30 pm at least three full court days before the next scheduled hearing date on the petition or pleading, e.g., for a court hearing on Wednesday, the objections must be filed by 4:30 p.m. the preceding Thursday. If written objections have not been filed in accordance with this rule, the court will either continue the matter to allow compliance with this rule or decide the matter as if no objection had been made pursuant to [California Rules of Court, rule] 7.801."

11   Indeed, on July 1, 2011—the date set for hearing of Denise's second accounting— the record shows Kirk's objections to that accounting were acknowledged by the court, and the matter was continued "pursuant to [the] Court's motion to 08/12/2011 at 09:30AM before Judge Harry L. Powazek." The record further shows the accounting issue was continued on the court's own motion from August 12, 2011 to November 18, 2011, to be heard at the trial readiness conference. The accounting issue, along with the trial date, were subsequently continued several more times on the court's own motion.

The court next turned to the issue of prejudice and asked Denise whether she wanted to continue the trial or to bifurcate from the trial any issues arising from Kirk's objection to the second accounting. The record shows Kirk agreed to the bifurcation. The court next took a short recess to allow the parties to discuss the issue off the record.

When court reconvened, Kirk represented the parties had reached an agreement in which he would, by the end of the day, provide Denise with a copy of his "highlighted" objections to the accounting and she, in turn, would withdraw her motion. Denise told the court that this representation was "basically correct" and that depending on the objections, the parties agreed she might need to call "another witness or two . . . but [she did not believe] it's really going to impede the progress of the trial and . . . it makes sense as a practical matter to carry on and try to get this resolved." Denise further indicated she was willing to "accept service of [Kirk's] objection[] today," and "that's an offer that's made in good faith." Thus, Denise declined the opportunity to bifurcate any issues arising from the second accounting from the other trial issues.

2. Analysis

The record very clearly shows that after the parties met and conferred during the court recess, they reached agreement on this issue. Among other terms, the parties agreed that, by the end of the day, Kirk would provide Denise with a copy of his "highlighted" objections to her second accounting and that, if necessary, Denise could call additional witnesses—including new witnesses—in order to respond to his objections. The record also shows the parties reached this agreement because it served

31

their mutual interest of ensuring the trial continued without delay and because Denise did not want to bifurcate from the main trial any issues arising from Kirk's objections to the second accounting.

On this record, we conclude Denise forfeited on appeal the issue whether the court allegedly erred when, out of "fairness," it found that Kirk had not waived his objections to the second accounting. (See *Japan Food Corp. v. County of Sacramento* (1976) 58 Cal.App.3d 891, 897 [noting that the stipulation of the parties regarding a factual issue rendered the issue moot on appeal].)

Even if Denise had not forfeited this issue, we nonetheless would conclude there was no error here. A trial court has broad discretion over procedural issues in the matters before it. (See *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 310.) Probate Code section 1043,[12] cited by Denise, provides a court has discretion to hear and decide an oral objection and/or to continue the matter to allow a party to make a written response, if the court deems that appropriate. We therefore disagree with Denise that the law precluded the court from exercising its discretion and finding Kirk had sufficiently

---

12      Probate Code section 1043 provides: "(a) An interested person may appear and make a response or objection in writing at or before the hearing. [¶] (b) An interested person may appear and make a response or objection *orally* at the hearing. The court in its *discretion shall either hear and determine the response or objection at the hearing, or grant a continuance for the purpose of allowing a response or objection to be made in writing*. [¶] (c) A request for a continuance for the purpose of making a written response or objection shall not itself be considered as a response or objection, nor shall the failure to make a response or objection during the time allowed be considered as a response or objection." (Italics added.)

preserved his objections to the second accounting, despite the fact they were not in writing.

Third, as shown *ante* in the statement of decision, the court limited its review of Denise's second accounting to the "financial transactions with respect to the Carlsbad property and her actions related to those transactions." The court therefore did not consider Kirk's line-item objections to the second accounting, other than those involving the Carlsbad property, and, thus, Denise was not prejudiced as a result thereof. For this separate and independent reason, we conclude the court did not err when it ruled Kirk's objections to the second accounting were preserved.

C. *Admission of Denise's Criminal Conviction and the Factual Statement Underlying Her Guilty Plea*

1. Additional Background

In February 2005, Denise pled guilty to one felony count and, as part of her plea agreement, admitted that she "knowingly" and "unlawfully" billed a workers' compensation carrier for chiropractic services she did not provide on the dates billed and that she did so "with the intention of making these false and fraudulent claims . . . ." As a result, Denise surrendered her chiropractic license for 18 months.

Denise moved in limine to exclude all evidence of her criminal conviction, guilty plea and the underlying criminal action against her. She contended the "whole issue of the insurance billing [was] . . . not relevant to any issue of the trust[] administration," inasmuch as her criminal conviction was ultimately set aside and her case dismissed

33

pursuant to Penal Code section 1203.4, subdivision (a)(1).[13]  Kirk disagreed and

countered that Denise's unequivocal admission of guilt satisfied the "definition of moral

turpitude" and was thus admissible because it remained in the public record even after her

conviction was set aside.

The court ruled as follows to admit limited portions of Denise's criminal matter:

"The setting aside of the conviction is only for limited purposes.  The issue really is to

what extent can some part of that conviction be used.  And the answer is that it can be

used for purposes of impeachment of her credibility, and so I will allow the record of the

conviction, which includes the charge of -- for which she was convicted, and also the

factual statement as part of the plea, I will allow that.  [¶]  The arrest reports, the other

charges are not admissible, and under [Evidence Code section] 352 I'm not going to

admit them.

"Now, there may be other information that's in that record, such as transactions

relating to the trust.  That's a different issue because it's not -- the evidence is not directly

---

13      Penal Code section 1203.4, subdivision (a)(1) provides in part:  "In any case in
which a defendant has fulfilled the conditions of probation for the entire period of
probation, or has been discharged prior to the termination of the period of probation, or in
any other case in which a court, in its discretion and the interests of justice, determines
that a defendant should be granted the relief available under this section, the defendant
shall, at any time after the termination of the period of probation, if he or she is not then
serving a sentence for any offense, on probation for any offense, or charged with the
commission of any offense, be permitted by the court to withdraw his or her plea of
guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been
convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in
either case, the court shall thereupon dismiss the accusations or information against the
defendant and except as noted below, he or she shall thereafter be released from all
penalties and disabilities resulting from the offense of which he or she has been
convicted . . . ."

and necessarily related to credibility as much as it is a course of conduct or a pattern of transactions related to the trust. So as to any particular transfers of assets into or out of the trust, I will deal with those when the offer is made. But they may be highly relevant to her conduct as a trustee or her use or misuse of the trust itself, so I'll deal with those issues as the evidence comes in."

2. <u>Governing Law and Analysis</u>

Evidence Code section 788 generally allows a party to attack the credibility of a witness by showing the witness has been convicted of a felony. However, subdivision (c) of Evidence Code section 788 provides that a felony conviction expunged under Penal Code section 1203.4 cannot be used to impeach the witness unless the witness is being prosecuted in a "criminal trial . . . for a subsequent offense."

The record shows a court in July 2009 granted Denise relief under Penal Code section 1203.4 by setting aside her conviction and terminating her probation "due to defendant's good conduct and reform." Thus, it would appear the court here erred when it ruled to admit for impeachment purposes Denise's criminal conviction and the factual statement supporting her guilty plea.

However, that does not end our inquiry because we further conclude the admission of such evidence was harmless as it was not reasonably probable that, absent its admission, Denise would have achieved a better result in this case. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801-802 [noting the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 applies to civil cases].)

We note that other than contending the criminal evidence wrongfully admitted by the court was "highly prejudicial," Denise presents no argument and proffers no evidence to show the court's error affected the outcome of the case.

More importantly, however, the court also found Denise intentionally omitted material information in connection with the preparation of two financial statements she submitted under *penalty of perjury* to probation regarding whether she then had the ability to repay her probation costs. Neither financial statement contained any reference to Denise's transfer to her mother of funds totaling about $367,000 and of real property she owned free and clear, which transfers, the court found, were without consideration and were to hide Denise's assets, or otherwise mentioned that Denise (allegedly) owned a one-half interest in the Carlsbad property.

In the instant case, Denise has not challenged on appeal the finding of the court that she "engaged in willful and intentional fraud in connection with the preparation of the two financial statements." In any event, we conclude this finding is supported by substantial evidence in the record (see *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 [noting under this standard an appellate court's review "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations"]) *and* supports the related finding of the court that Denise's credibility was substantially compromised. As such, any error by the court in admitting for impeachment purposes Denise's criminal conviction and the factual predicate underlying

36

her guilty plea was altogether harmless. (See *Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 801-802.)[14]

D. *Sufficiency of the Evidence Challenges by Denise*

Denise next contends the court, as trier of fact, "failed to properly weigh and understand the evidence presented" by her regarding (i) whether she was "entitled to reimbursement of any funds she either lent the trust or which were hers to begin with"; (ii) whether she breached her fiduciary duty as a cotrustee of the trust by, among other things, unilaterally preparing and filing an amended estate tax return where she sought for herself only a tax refund of about $331,000; and (iii) the overarching issue of whether she and the decedent entered into a partnership agreement in connection with the purchase and maintenance of the Carlsbad property.

As we explain, we reject her challenge to these findings because we conclude there is ample evidence in the record supporting them.

1. Standard of Review

In determining whether substantial evidence supports a finding, we must "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment."

---

14    There was ample other evidence supporting the finding Denise's credibility was compromised, including (i) the testimony of her colleague Adam Fogelman, D.C., who was of the opinion that Denise was untrustworthy and (ii) the evidence that Denise prepared an amended form 706 estate tax return (discussed *post*) without the input, consent or knowledge of Kirk, her cotrustee, which the court found was done with the view to "place herself in the position of receiving a tax refund in the sum of $331,006.00 without the knowledge of [Kirk]."

(*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)  "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.  Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment." (*Id.* at pp. 630–631.)

If substantial evidence is present, "no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld.  As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing."  (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

2.  Reimbursement of Funds Transferred by Denise to the Decedent During the Criminal Investigation of Denise

On the issue of the funds Denise transferred to the decedent and/or the trust during the criminal investigation, we conclude substantial evidence in the record supports the court's finding that Denise was repaid nearly all of these funds.  The record includes a document prepared by Denise entitled "Summary of Funds from Denise . . . to Kelly [i.e., the decedent]" (summary), which identifies six transfers of funds by Denise totaling about $367,000.  The record also includes a document prepared by the decedent in November 2005 entitled "Final Accounting -- Nisha"[15] (final accounting), which the

_____

[15]    "Nisha" was the family nickname for Denise.

38

decedent periodically updated and which memorialized the status of the various transfers by Denise.

Transfer one by Denise was in the amount of $57,900. As discussed *post*, the trial court as fact finder rejected Denise's contention that her transfer of $57,900 was purchase money for the Carlsbad property. In so doing, the court relied in part on the final accounting prepared by the decedent, in which the decedent wrote: "I will pay your escrow contribution of $57,900 when you tell me you need it. I don't know where you are coming from to tell people you put $130,000 in this house. That is not true unless you can prove me wrong.?!"

The record shows Denise subsequently wrote her mother, "I Denise Shanley did tell Kelly Shanley that I needed pay-back of the $57,900. This was when I returned from taking care of my father in Oklahoma for two months. On August 18, 2007 Kelly gave me the attached bank statements as reference agreement was made between Denise Shanley that $60,000 would be paid from [a] Washington Mutual acc[ount] on 9-10-07 (the CD maturity date)."

Kirk's expert, William Sturgeon, CPA, testified that since both Denise and Kirk were identified as beneficiaries on the above-referenced CD, the funds in that account were subsequently split and each received $53,073.50. The record also shows the decedent prepared a letter dated October 25, 2005 addressed to "whom it may concern" showing $7,500 being subtracted from the $57,900 figure in reference to an "attorney" fee ostensibly paid by the decedent for Denise's benefit.

39

Transfer two was in the amount of $25,000. Sturgeon testified that in March 2004, Denise transferred this money into one of the decedent's accounts; that in June 2004, the $25,000 was transferred into another account as part of a $42,000 deposit; and that in January 2006, the decedent opened a new account by depositing $50,000 for the purpose of repaying Denise for this transfer and transfer six (discussed *post*). Sturgeon further testified Denise cashed out this account in November 2006 and received $51,348 (with interest).

Transfer three was in the amount of $82,414.80. Sturgeon testified that these funds were deposited into an account jointly owned by Denise and the decedent but that only Denise used this account. Denise withdrew these funds after the death of the decedent.

Transfer four was in the amount of about $102,000. Sturgeon testified these funds were deposited into a joint account of Denise and the decedent (account 7870). The decedent described account 7870 in the final accounting as a "joint account in name only" and noted that Denise had the checkbook for this account and that the decedent had "nothing to do with this account." The record shows Denise closed account 7870 and withdrew the funds after the decedent's death.

Transfer five was for $75,000. Sturgeon testified this money initially was transferred into an account held solely by the decedent, but it was subsequently transferred into account 7870 and withdrawn by Denise.

Transfer six was in the amount of $25,000. Sturgeon testified this amount was deposited, along with the $25,000 referenced *ante* in connection with transfer two, in an account jointly held by Denise and the decedent. As noted, Sturgeon testified Denise cashed out this account in November 2006 and received about $51,348.

In view of the above evidence in the record, Sturgeon testified Denise received all but about $2,800 of the approximately $367,000 she transferred to the decedent. The court accepted this finding, and we conclude there is sufficient evidence in the record to support it.[16]

### 3. Breach of Fiduciary Duty

Denise contends there is a lack of evidence in the record to support the finding she breached her fiduciary duty as cotrustee of the decedent's trust.

Denise's primary contention on this issue is that the record does not support the finding of the court that it was "highly probable" she was seeking to defraud Kirk out of his share of any purported tax refund when she unilaterally prepared and filed an amended form 706 estate tax return (amended 706 filing) without the input, consent or knowledge of her cotrustee brother. In the amended 706 filing, Denise sought to reduce the value of the gross estate by alleging she received a gift from the decedent of $217,314

---

[16]    As noted *ante*, the court found Denise received about $2,800 less from the decedent and/or the decedent's trust/estate than Denise had transferred to the decedent during Denise's pending criminal investigation. The court also found, however, Denise was unable to identify any specific trust account or fund of the decedent to which Denise was entitled to obtain any additional reimbursement.

and by asserting a creditor's claim in the sum of $437,922, with Denise individually named as the creditor.

The court found Denise prepared the amended 706 filing to "place herself in the position of receiving a tax refund in the sum of $331,006.00 without the knowledge of [Kirk]," and given the "animosity between the parties and [her] deficits in character, it is highly probable that [Denise] was intentionally putting herself in a position where she could defraud her brother of his share of the tax refund. Also, in filing this return unilaterally, she violated the terms of the trust which required her to act jointly with [Kirk]."

The record shows Denise identified herself in the amended 706 filing as the sole trustee, despite the fact she and her brother were acting as cotrustees. The record also shows Denise waited until three *days* before trial commenced to disclose to Kirk the existence of the amended 706 filing, despite filing the amended tax return more than six months earlier.

We therefore conclude the court's finding that Denise breached her fiduciary duty as cotrustee of the trust in connection with her preparation of the amended 706 filing is supported by substantial evidence in the record, including the inferences reasonably drawn from that evidence. (See *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489 [noting that ""when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the [fact finder]""" and noting that if substantial evidence is found, "*it is of no consequence that the*

42

*[jury] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*"'"].)

We also conclude substantial evidence in the record supports the court's finding that Denise breached her fiduciary duty as cotrustee of the trust in other respects including by: (i) failing to cooperate reasonably with Kirk and to divide and distribute the trust assets within a reasonable time (see Prob. Code, §§ 16000 & 16040); (ii) manipulating trust accounts in order to support her claim to a half-ownership interest in the Carlsbad property (see Prob. Code, §§ 16003 & 16004); and (iii) failing to keep Kirk informed of all matters related to the trust administration (see Prob. Code, § 16061). We thus reject Denise's contention there was a lack of evidence in the record to support the finding she breached her fiduciary duty as cotrustee of the trust.

4. Existence of Alleged Partnership Agreement between Denise and the Decedent

Denise next contends the court "[i]mproperly [d]isregarded" her evidence to show the existence of a valid and enforceable partnership agreement between her and the decedent in connection with the purchase and maintenance of the Carlsbad property. Denise contends she and her mother had a written partnership agreement that ostensibly was removed from the Carlsbad property, as testified to by her and other "credible witnesses."

However, the record in this case and the statement of decision based on the record clearly show the court considered this testimony and, in its role as fact finder, rejected it. As a court of review, our role is not to reconsider testimony anew, evaluate the credibility

43

of witnesses and reach new and different findings than those of the fact finder when those findings are supported by substantial evidence in the record.  (See *Piedra v. Dugan*, *supra*, 123 Cal.App.4th at p. 1489; see also *Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143 [noting that "'[w]hen a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination'"].)

Substantial evidence supports the finding of the court that there was no partnership agreement between Denise and the decedent concerning the ownership and maintenance of the Carlsbad property.  As noted *ante*, the final accounting prepared by the decedent shows the decedent did not consider the $57,900 transfer by Denise to be purchase money for the Carlsbad property.

Moreover, the decedent in the final accounting also scolded Denise for telling people after the fact that Denise had put money towards the purchase of the Carlsbad property and expressed relief that Denise had taken "no financial responsibility" for the Carlsbad property.  With regard to the latter point, the decedent wrote, "I would be in real deep crap right now if I had taken the liberty of using your assets to finance it [the Carlsbad property].  This would leave you [i.e., Denise] in a very deep hole when the law suit [i.e., criminal prosecution] hit and your income stopped."

The record also shows that when the decedent purchased the Carlsbad property in March 2004, she took title in her name only. A few months later, the decedent transferred title to the Carlsbad property into the name of her trust, where it remained until the time of her death. However, in late December 2004, the decedent signed a notarized but unrecorded quitclaim deed purporting to transfer to Denise and Kirk each a one-quarter interest in the Carlsbad property, with the trust owning the remaining one-half interest. We conclude this evidence—on which the court relied—is more than sufficient to support the finding that the decedent and Denise were not partners in connection with the ownership and maintenance of the Carlsbad property.

Our conclusion is further buttressed by the testimony of Sturgeon who, after analyzing the various transfers between the decedent and Denise, opined that Denise had been repaid nearly all of the money she transferred to the decedent during the pendency of the criminal action against her.

We therefore reject Denise's challenge on sufficiency of the evidence grounds to the finding there was no partnership agreement between Denise and the decedent concerning the ownership and maintenance of the Carlsbad property. (See *Piedra v. Dugan*, *supra*, 123 Cal.App.4th at p. 1489.)[17]

---

[17]    Denise also summarily contends that Kirk should have been surcharged $35,000 in lieu of the $17,500 found by the court in connection with his portion of the estate taxes he did not pay. Denise, however, failed to make this argument below, despite having the opportunity to do so as provided in the *tentative* statement of decision. We thus consider this factual issue forfeited on appeal. (See generally *Feduniak v. California Costal Com.* (2007) 148 Cal.App.4th 1346, 1381 [noting that failure to raise an issue in the trial court forfeits that point on appeal]; see also *In re Josue S.* (1999) 72 Cal.App.4th 168, 171 [noting it is unfair both to the trial court and adverse party for an adverse party to take

DISPOSITION

The judgment is affirmed.  Kirk to recover his costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


O'ROURKE, J.

---

advantage of an alleged error on appeal that easily could have been corrected and/or addressed when it first occurred]; *Japan Food Corp. v. County of Sacramento*, *supra*, 58 Cal.App.3d at p. 897 [rejecting attempt by the defendants "to place this court in the unenviable position of belatedly having to decide a question of fact . . . , a task which we are ill-equipped to do"].)